## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| JUDICIAL WATCH, INC., ) | |
| ) | Civil Action No. |
| Plaintiff, ) | 1:11-cv-00890-JEB |
| ) | |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF DEFENSE, and ) | |
| CENTRAL INTELLIGENCE AGENCY, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, defendants U.S. Department of Defense and the Central

Intelligence Agency respectfully move the Court for summary judgment in their favor, as there is

no genuine issue of material fact precluding judgment in their favor.  The reasons for defendants'

motion are set forth in the accompanying Memorandum of Law and attachments thereto.


Respectfully Submitted,

TONY WEST
Assistant Attorney General

IAN H. GERSHENGORN
Deputy Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

RONALD C. MACHEN JR.
United States Attorney

 /s/ Marcia Berman
ELIZABETH J. SHAPIRO (D.C. Bar No. 418925)
MARCIA BERMAN ((PA Bar No. 66168)
United States Department of Justice

Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7132
Washington, D.C.  20530
Tel.: (202) 514-2205
Fax: (202) 616-8470
Email: elizabeth.shapiro@usdoj.gov
       marcia.berman@usdoj.gov

Attorneys for Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 1:11-cv-00890-JEB |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF DEFENSE, and | ) | |
| CENTRAL INTELLIGENCE AGENCY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

In this Freedom of Information Act ("FOIA") case, plaintiff Judicial Watch, Inc. seeks public disclosure of photographs and/or video recordings taken of Osama bin Laden during or after the May 1, 2011 raid in Pakistan that resulted in bin Laden's death. The Central Intelligence Agency ("CIA") located fifty-two responsive records but is withholding them in their entirety pursuant to FOIA Exemption 1, which protects classified information from disclosure, and Exemption 3, which incorporates other nondisclosure statutes. The CIA, the Department of Defense ("DoD"), and indeed, the President, have all correctly determined that images of Osama bin Laden after he was killed by United States forces must not be publicly disclosed in the interest of national security. Among other reasons, the danger is simply too great that dissemination of these images would inflame anti-American sentiments and provoke violent attacks on the United States or its citizens abroad.

Plaintiff's amended complaint is therefore easily disposed of on summary judgment. The

defendant agencies conducted reasonable searches.  Although DoD did not locate any responsive records (and should therefore be dismissed on this ground alone), the CIA did locate records and properly determined that they are wholly exempt from disclosure.  Declarations from high-ranking CIA and DoD officials provide compelling explanations for why release of the responsive records is reasonably likely to harm the national defense and foreign relations of the United States.  These declarations easily meet the deferential standard by which courts review the Executive Branch's assessment of harm to the national security.  Accordingly, pursuant to 5 U.S.C. §§ 552(b)(1) and (b)(3), the Court should grant the agencies summary judgment and dismiss the amended complaint in its entirety.

## BACKGROUND

### I.      May 1, 2011 Raid on Osama bin Laden's Compound.

On Sunday night, May 1, 2011, President Obama announced to the American people and the world that the United States had conducted an operation that killed Osama bin Laden, the leader of al-Qa'ida.  The President said, "Today, at my direction, the United States launched a targeted operation against th[e] compound in Abbottabad, Pakistan [where Osama bin Laden was hiding out].  A small team of Americans carried out the operation with extraordinary courage and capability.  No Americans were harmed.  They took care to avoid civilian casualties.  After a firefight, they killed Osama bin Laden and took custody of his body."[1]

The President subsequently confirmed that photographs were taken of bin Laden and that facial analysis was done that indicated that it was him.  The President also confirmed that the

---

[1] Transcript of President Obama's May 1, 2011 remarks, available at http://www.whitehouse.gov/the-press-office/2011/05/02/remarks-president-osama-bin-laden.

photographs would not be released.  In an interview with 60 Minutes reporter Steve Kroft, the

President explained why:

> KROFT:  Did you see the pictures?
>
> PRESIDENT OBAMA:  Yes.
>
> KROFT:  What was your reaction when you saw them?
>
> PRESIDENT OBAMA:  It was him.
>
> KROFT:  Why haven't you released them?
>
> PRESIDENT OBAMA:  You know, we discussed this internally.  Keep in mind
> that we are absolutely certain this was him.  We've done DNA sampling and
> testing.  And so there is no doubt that we killed Osama bin Laden.  It is important
> for us to make sure that very graphic photos of somebody who was shot in the
> head are not floating around as an incitement to additional violence.  As a
> propaganda tool.
>
> You know, that's not who we are.  You know, we don't trot out this stuff
> as trophies. You know, the fact of the matter is this was somebody who was
> deserving of the justice that he received.  And I think Americans and people
> around the world are glad that he's gone.  But we don't need to spike the football.
> And I think that given the graphic nature of these photos, it would create some
> national security risk.  And I've discussed this with Bob Gates and Hillary
> Clinton and my intelligence teams and they all agree.[2]

---

[2]  May 8, 2011 60 Minutes interview with President Obama, transcript available at
http://www.cbsnews.com/8301-504803_162-20060530-10391709.html.

**II.      Plaintiff's FOIA Requests and Lawsuit**.

On May 2, 2011, Judicial Watch sent a request to the CIA and DoD under the FOIA seeking "all photographs and/or video recordings of Osama (Usama) Bin Laden taken during and/or after the U.S. military operation in Pakistan on or about May 1, 2011."  Declaration of John Bennett, Director, National Clandestine Service ("NCS"), Central Intelligence Agency, at ¶ 5 and Exhibit A ("Bennett decl."); Declaration of William T. Kammer at ¶ 3 and Exhibit 1 ("Kammer decl.").  The agencies both provided interim responses stating that it was unlikely that they would be able to provide substantive responses within the 20-day statutory time period under FOIA.  Bennett decl. at ¶ 7 and Exhibit B; Kammer decl. at ¶ 3 and Exhibit 2.  On May 13, 2011, Judicial Watch filed a lawsuit against DoD seeking release of the requested records.  Subsequently, Judicial Watch amended its complaint to add the CIA as a defendant.  The defendant agencies answered the amended complaint on June 28, 2011.

**III.     Defendants' Responses to Plaintiff's FOIA Requests**.

Following receipt of the plaintiff's FOIA request, the CIA and DoD conducted searches for responsive records.  Both agencies thoroughly searched the components that were most likely to have responsive records related to the May 1, 2011 operation.  Bennett decl. at ¶ 10; Kammer decl. at ¶¶ 4-8.  DoD located no responsive records.  Kammer decl. at ¶¶ 5, 7, 8.   The CIA, however, located a total of fifty-two unique responsive records.  Bennett decl. at ¶ 11.  These records contain images of Osama bin Laden's body after he was killed.  Many are graphic and gruesome, as they depict the fatal bullet wound to bin Laden's head.  *Id*.  Some of the images were taken inside the compound in Abbottabad, Pakistan, where bin Laden was killed.  Other images were taken as bin Laden's body was transported from the Abbottabad compound to the

4

location where he was buried at sea.  *Id*.  Several images depict the preparation of Osama bin

Laden's body for the burial as well as the burial itself.  *Id*.  Additionally, some of the images

were taken so that the CIA could conduct a facial recognition analysis in order to confirm that

the body was that of Osama bin Laden.  The CIA's facial recognition technology, which is

highly classified, compares unique facial features, such as bone structure, age spots, hair growth

patterns, and the size and shape of the eyes, ears, and nose, as well as the relative positioning of

facial features.  *Id*.  The CIA compared historic photographs of Osama bin Laden with some of

the responsive photographs and concluded with high confidence that the deceased individual was

in fact Osama bin Laden.  *Id*.

The CIA withheld the fifty-two responsive records in their entirety pursuant to FOIA

Exemptions 1 and 3.  5 U.S.C. §§  552(b)(1), (3); Bennett decl. at ¶¶ 13-34.  The CIA

specifically determined that no reasonably segregable, non-exempt portions of the responsive

records could be released.  Bennett decl. at ¶ 35.  The withholdings are fully supported by

declarations submitted by (1) John Bennett, Director, National Clandestine Service, Central

Intelligence Agency; (2) Admiral William H. McRaven, Commander, United States Special

Operations Command; (3) Lieutenant General Robert B. Neller, Director of Operations, J-3, on

the Joint Staff at the Pentagon; and (4) William T. Kammer, Chief, Office of Freedom of

Information Division, Executive Services Directorate, Washington Headquarters Service, a

Component of DoD.  DoD submits Admiral McRaven's declaration in a classified form,

pursuant to 5 U.S.C. § 552(a)(4)(B) (providing for *in camera* review) and case law authorizing

an agency to submit a classified declaration to augment its explanation of the harm to national

security where such explanation cannot be made on the public record.  *See*., *e.g.*, *Hayden v. NSA*,

608 F.2d 1381, 1384 (D.C. Cir. 1979); *Public Education Center v. DoD*, 905 F. Supp. 19, 22

(D.D.C. 1995).  A redacted version of the classified declaration is appended to this

memorandum.

## ARGUMENT

## I.      THIS FOIA CASE IS APPROPRIATELY DISPOSED OF ON SUMMARY JUDGMENT.

The Freedom of Information Act, 5 U.S.C. 552 ("FOIA"), represents a balance struck by

Congress "'between the right of the public to know and the need of the Government to keep

information in confidence.'"  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)

(quoting H.R. Rep. 89-1497, 89th Cong., 2d Sess., 6 (1966)).  Thus, while FOIA requires

disclosure under certain circumstances, the statute recognizes "that public disclosure is not

always in the public interest."  *Baldrige v. Shapiro*, 455 U.S. 345, 352 (1982).  Consequently,

FOIA "provides that agency records may be withheld from disclosure under any one of the nine

exemptions defined in 5 U.S.C. § 552(b)."  *Id*.  "These exemptions reflect Congress' recognition

that the Executive Branch must have the ability to keep certain types of information

confidential."  *Hale v. DOJ*, 973 F.2d 894, 898 (10th Cir. 1992), *vacated on other grounds*, 509

U.S. 918 (1993) (Mem.).  *See also Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C.

Cir. 2003).  While the statutory exemptions are to be narrowly construed, they must also be

construed "to have a meaningful reach and application."  *John Doe*, 493 U.S. at 152.

Most FOIA cases are resolved by summary judgment based on agency affidavits or

declarations.  Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  If an agency's affidavit or declaration describes the justifications for

withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit or declaration alone. *ACLU v. DoD*, 628 F.3d 612, 619 (D.C. Cir. 2011); *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009).

In a case involving national security matters such as this one, courts "must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (quotations omitted); *see also ACLU*, 628 F.3d at 619. This is because courts "lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case." *Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993). "[T]he court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency." *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980). For these reasons, courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927; *see also Larson*, 565 F.3d at 865 ("Today we reaffirm our deferential posture in FOIA cases regarding the 'uniquely executive purview' of national security."); *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (holding that the district court erred in "perform[ing] its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure").

"'Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears "logical" or "plausible."'" *Larson*, 565 F.3d at 862 (quoting *Wolf*, 473 F.3d at 374-75).

In this case, the CIA and DoD have submitted detailed declarations explaining the basis for the classification and withholding of the responsive records.  These explanations are not only logical and plausible, but also compelling and persuasive.  Accordingly, summary judgment is appropriate.

## II.    DoD MUST BE DISMISSED BECAUSE, AFTER CONDUCTING A REASONABLE SEARCH, IT LOCATED NO RESPONSIVE RECORDS.

A court possesses jurisdiction under FOIA to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. § 552 (a)(4)(B).  If, after conducting an adequate search, the agency locates no responsive documents, there is nothing left for the court to do other than dismiss the claim.  *See, e.g., Paisley v. CIA*, 712 F.2d 686, 689 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984); *James Madison Project v. CIA*, 593 F. Supp. 2d 78 (D.D.C. 2009).

An agency can show that it has conducted an adequate search for records responsive to a FOIA request by demonstrating, through affidavits or declarations, that it has conducted "a search reasonably calculated to uncover all relevant documents."  *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (internal quotation marks omitted).  "[A]dequacy is measured by the reasonableness of the effort in light of the specific request."  *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986).  The agency is not required to search every record system, but need only search those systems in which it believes responsive records are likely to be located.  *See Morley*, 508 F.3d at 1120.

In this case, DoD conducted a reasonable search for the records plaintiff requested.  DoD determined that the components likely to have records responsive to plaintiff's request were the

8

Office of the Chairman of the Joint Chiefs of Staff ("OCJCS"), the U.S. Special Operations Command ("USSOCOM"), and the Department of the Navy.  Kammer decl. at ¶ 4.  Within the OCJCS, a single action officer in the Directorate for Global Operations maintained all documents related to the May 1, 2011 operation.  This officer searched all hard copy records and the only stand alone computer used to store electronic records, and no responsive records were located.  Additionally, the email files of the Chairman of the Joint Chiefs of Staff, Admiral Mike Mullen, were searched, and no responsive records were located.  *Id*. at ¶ 5.  USSOCOM searched the Headquarters and relevant military service components, and no records responsive to plaintiff's request were located.  *Id*. at ¶¶ 6-7.

Osama bin Laden's body was buried at sea from the U.S. Navy aircraft carrier USS Carl Vinson.  No USS Carl Vinson personnel took any photographs or videos of the burial.  Emails in the ship's computers system discussing the operation were reviewed, however, in an effort to identify any mention of responsive photographs or video recordings.  This effort did not reveal evidence of any such photographs or video recordings on the USS Carl Vinson.  Kammer decl. at ¶ 8.

Because DoD conducted a reasonable search but located no records responsive to plaintiff's request, summary judgment should be granted in DoD's favor, and DoD should be dismissed from this suit.[3]

---

[3] The CIA conducted a similarly reasonable search, *see* Bennett decl. at ¶ 10, which did locate responsive records.  The withholding of the CIA's records is explained below.  Although the CIA considered the harms identified by DoD when classifying the responsive records, and DoD has submitted declarations explaining those harms, the responsive records at issue in this case were located at the CIA and belong to the CIA.  *Id*. at ¶¶ 10-11.

### III.   THE RESPONSIVE RECORDS ARE PROPERLY CLASSIFIED AS TOP SECRET AND EXEMPT FROM DISCLOSURE UNDER EXEMPTION 1.

Exemption 1 provides that FOIA's disclosure requirements do not apply to matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  "[L]ittle proof or explanation is required beyond a plausible assertion that information is properly classified."  *Morley,* 508 F.3d at 1124.  Because assessment of harm to national security is entrusted to the Executive Branch rather than the courts, "the government's burden is a light one;" "searching judicial review" is inappropriate; and "plausible" and "logical" arguments for nondisclosure will be sustained. *ACLU*, 628 F.3d at 614.

The withheld information was properly classified under Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009).  A prerequisite for classification under Executive Order 13,526 is that "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage."  Exec. Order No. 13,526 § 1.1(a)(4).  National security is defined as the national defense or foreign relations of the United States.  *Id*. § 6.1(cc).  Under the Executive Order, information may only be classified if it falls within prescribed categories of information, and if its unauthorized disclosure reasonably could be expected to cause identifiable or describable damage to the national security.  *Id*. §§ 1.2, 1.4.  Information may be classified at different levels, ranging from "Confidential" to "Top Secret," depending on the degree of harm to national security that unauthorized disclosure could cause.  *Id*. § 1.2.

10

As the agencies' declarations establish, the responsive records pertain to the following categories of information included in Executive Order 13,526:  military plans, weapons systems, or operations; intelligence activities and intelligence sources or methods; and foreign relations or foreign activities of the United States.  Exec. Order No. 13,526 § 1.4(a), (c), (d); Bennett decl. at ¶¶ 21, 28-29; Declaration of William H. McRaven at ¶ 3 ("McRaven decl.") (redacted version).[4] "[A]ll of the responsive records are the product of a highly sensitive, overseas operation that was conducted under the direction of the CIA; accordingly, . . . all of the records pertain to intelligence activities and/or methods as well as the foreign relations and foreign activities of the United States."  Bennett decl. at ¶ 21.  *See also ACLU v. DOJ*, – F. Supp. 2d –, 2011 WL 4005324 at * 15 (D.D.C. Sept. 9, 2011).

Certain responsive records pertain to intelligence methods and activities because they "provid[e] insight into the manner in which the photographs or video recordings were obtained as well as the purpose, utility, or manner in which the photographs or video recordings could be used by the CIA and the extent or limitations of such capabilities."  Bennett decl. at ¶ 29.  For example, release of post-mortem photographs taken to conduct facial recognition analysis could provide insight into the manner in which such analysis is conducted or the extent or limitation of such analysis.  *Id*.  Release of other images could reveal the types of equipment or other tools that were utilized (or not) during the execution of a highly sensitive intelligence operation, as well as information regarding the purpose, extent, or limitations of such tools.  *Id*.  The classified declaration submitted by Admiral McRaven further explains how the responsive records reveal

---

[4]  As noted earlier, *see supra* at n. 3, the CIA's declaration makes clear that in classifying the responsive records, it took into account the specific DoD equities set forth in the declarations submitted by Admiral McRaven and Lt. Gen. Neller.  *See* Bennett decl. at ¶¶ 21-22.

information pertaining to military operations, including classified Sensitive Site Exploitation Tactics, Techniques, and Procedures and the methods that special operations forces use for identification of captured and killed personnel.  McRaven decl. at ¶ 3 (redacted version); *see also* Bennett decl. at ¶ 21.

The declarations establish that release of the responsive records reasonably could be expected to cause harm to the national security of the United States.  The CIA's declarant, John Bennett, determined that all of the records are properly classified as "Top Secret" because "their unauthorized disclosure reasonably could be expected to result in exceptionally grave damage to the national security."  Bennett decl. at ¶ 22; *see also* Exec. Order No. 13,526 § 1.2(a)(1).  Mr. Bennett is the Director of the CIA's National Clandestine Service, the organization within the CIA responsible for conducting the CIA's foreign intelligence and counterintelligence activities.  Bennett decl. at ¶ 2.  Mr. Bennett has over twenty-five years of experience as a CIA officer, and most of his career with the CIA was spent in overseas operational positions.  *Id*. at ¶ 1.  Mr. Bennett's determination that the responsive records are properly classified was based on, among other things, his lifetime of service with the CIA, his familiarity with the May 1, 2011 operation in which bin Laden was killed and the responsive records related thereto, and his "experience in countering the current threat that the United States faces from al-Qa'ida and other hostile groups around the world."  *Id*. at ¶ 4.

The responsive records depict Osama bin Laden after he was killed by U.S. forces, and many graphically show the fatal bullet wound to bin Laden's head and other gruesome images. *Id*. at ¶¶ 11, 23.  Mr. Bennett logically determined that release of such graphic images of Osama bin Laden, the founding father of al-Qa'ida, taken after his death at the hands of the United

States, could reasonably be expected to inflame anti-American sentiment and provoke deadly

attacks on the United States or its citizens abroad.  Al-Qa'ida, which has openly declared war on

the United States and is committed to killing innocent Americans, has vowed to retaliate for the

death of its leader, Osama bin Laden.  The mere release of these images of Osama bin Laden

could be interpreted as a deliberate attempt by the United States to humiliate the late al-Qa'ida

leader, which could trigger violence, attacks, or acts of revenge against the United States.

Bennett decl. at ¶¶ 23-27.

In addition, "the public release of the responsive records would provide terrorist groups

and other entities hostile to the United States with information to create propaganda which, in

turn, could be used to recruit, raise funds, inflame tensions, or rally support for causes and

actions that reasonably could be expected to result in exceptionally grave damage to both the

national defense and foreign relations of the United States." *Id*. at ¶ 24.  "Al-Qa'ida has a very

effective propaganda operation," *id*., and it has made such use of information they believe could

be inflammatory before.  For example, information about abuse of Iraqi detainees at the Abu

Ghraib prison was used by al-Qa'ida on extremist websites that recruit jihadists and solicit

financial support.  *Id*.  As explained by Mr. Bennett, there is every reason to believe that al-

Qa'ida would use these images of bin Laden's body to inflame jihadist support and inspire

attacks on the United States.  *Id*.  This belief "is not merely conjectural."  *Id*. at ¶ 25.  In fact, al-

Qa'ida already has used the circumstances surrounding Osama bin Laden's death and burial to

recruit and further its goals.  *Id*. (discussing al-Qa'ida media communications devoted to bin

Laden's "martyrdom" and criticism of his burial).  Thus, Mr. Bennett reasonably determined that

"releasing post-mortem images of [bin Laden] that reflect the gruesome nature of his fatal

13

injuries, as well as his burial at sea, could enhance al-Qa'ida's efforts to use these events to

further attack and otherwise inflict exceptionally grave damage to the security interests of the

United States." *Id*.

DoD further determined that release of the responsive records "will pose a clear and

grave risk of inciting violence and riots against U.S. and Coalition forces." Declaration of

Robert B. Neller at ¶ 6 ("Neller decl."). Lieutenant General Neller is the Director of Operations,

J-3, on the Joint Staff at the Pentagon. The J-3 is responsible for all DoD operational matters

outside the continental United States. *Id*. at ¶ 1. Lt. Gen. Neller based his determination of harm

on his years of experience and judgment as well as on past incidents of violence erupting

following disclosures that al-Qa'ida used as propaganda. *Id*. at ¶¶ 6-9. For example, Lt. Gen.

Neller discusses in his declaration the violence that followed inaccurate reporting that U.S.

military personnel at Guantanamo Bay, Cuba, had desecrated the Koran, and how the re-

publication of the Danish cartoon depicting the Prophet Muhammad was used to stir violent

reactions in Afghanistan and worldwide. *Id*. at ¶¶ 7-8. He concludes, "I believe that the release

of the responsive records would reasonably be expected to endanger the lives and physical safety

of the approximately 98,000 U.S. troops in Afghanistan, endanger the lives and physical safety

of Afghan civilians at large, and police and military personnel of the Government of

Afghanistan, aid the recruitment efforts and other activities of insurgent elements, and increase

the likelihood of violence against United States interests, personnel and citizens worldwide." *Id*.

at ¶ 9. The argument for nondisclosure here clearly and easily meets the "plausible" and

"logical" standard of review. *ACLU*, 628 F.3d at 614.

Release of the responsive records could also reasonably be expected to harm national

security by revealing sensitive information about intelligence methods and activities and military operations.  Release of certain photographs and/or video recordings could reveal the manner in which, and purpose for which, they were obtained, or could reveal the types of equipment or other tools that were utilized (or not) during this operation.  The disclosure of such information could allow hostile forces to evade, counter, or replicate the CIA's intelligence methods, thereby limiting their utility or making them obsolete.  Bennett decl. at ¶¶ 28-30.  Once an intelligence method is discovered, its continued successful use is seriously jeopardized.  If information about a particular intelligence method is disclosed, that information can be used by our adversaries to detect, prevent, or damage U.S. intelligence operations or to advance hostile operations against the United States.  *Id*. at ¶ 28.  *See also Larson*, 565 F.3d at 863.  It is both plausible and logical that such disclosure might harm national security.  *See, e.g., ACLU*, 628 F.3d at 624-25 (crediting the CIA's assertion that disclosure of information relating to the capture, detention, and interrogation of "high value" detainees would potentially damage national security by revealing the CIA's needs, priorities, and capabilities and degrading the CIA's ability to effectively question terrorist detainees); *Int'l Counsel Bureau v. DoD*, 723 F. Supp. 2d 54, 63 (D.D.C. 2010) (videos showing how military personnel at Guantanamo Bay forcibly move prisoners in and out of their cells were properly classified, where agency explained that these sensitive internal procedures, if released, would permit hostile entities to develop counter-tactics).  Moreover, even seemingly innocuous details contained in the responsive records could be harmful if pieced together with other information by foreign intelligence services.  Bennett decl. at ¶ 29.  *See also Larson*, 565 F.3d at 863; *Wolf*, 473 F.3d at 377.

Specific explanations of why release of responsive records would undermine national

security by revealing sensitive military operations are set forth in the classified declaration of

Admiral McRaven.  Admiral McRaven is currently serving as Commander, United States

Special Operations Command ("USSOCOM"), a component of DoD.  McRaven decl. at ¶ 1

(redacted version).  USSOCOM ensures the readiness of joint special operations forces and

conducts worldwide operations.  *Id.*  Admiral McRaven based his conclusions on his years of

service and experience in the U.S. military and in special operations units.  *Id.* at ¶ 4.  Admiral

McRaven describes specifically how the responsive records reveal sensitive information

pertaining to military operations, and how their disclosure could reasonably be expected to cause

damage to national security.  *See Public Education Center, Inc. v. DoD*, 905 F. Supp. 19, 22

(D.D.C. 1995) (classified declaration supported DoD's withholding under Exemption 1 of

videotapes made during the 1993 raid by U.S. armed forces in Mogadishu, Somalia).  He

concludes that "the release of the responsive records could reasonably be expected to: (a) make

the special operations unit that participated in this operation and its members more readily

identifiable in the future; (b) reveal classified Sensitive Site Exploitation Tactics, Techniques,

and Procedures and other classified information specific to special operations; and (c) reveal the

methods that special operations forces use for identification of captured and killed personnel so

that the enemy could develop counter-measures to defeat future military operations."  McRaven

decl. at ¶ 3 (redacted version).

Because CIA NCS Director Bennett, Admiral McRaven, and Lt. Gen. Neller together

have amply and logically explained the exceptionally grave harm to national security that may

reasonably occur through the release of the responsive records, the CIA's reliance on Exemption

1 to withhold the records was entirely appropriate.  Summary judgment should therefore be

16

granted in its favor.

## IV.   THE RESPONSIVE RECORDS ARE ALSO EXEMPT FROM DISCLOSURE UNDER FOIA EXEMPTION 3.

The withheld materials are also exempt from disclosure under FOIA Exemption 3.

Under Exemption 3, matters "specifically exempted from disclosure" by certain statutes need not

be disclosed.  5 U.S.C. § 552(b)(3).  In examining an Exemption 3 claim, a court determines

whether the claimed statute is an exemption statute under FOIA and whether the withheld

material satisfies the criteria of the exemption statute.  *CIA v. Sims*, 471 U.S. 159, 167 (1985).

"Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the

detailed factual contents of specific documents; the sole issue for decision is the existence of a

relevant statute and the inclusion of withheld material within that statute's coverage."  *Goland v.

CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978).  Thus, a court should "not closely scrutinize the

contents of a withheld document; instead, [it should] determine only whether there is a relevant

statute and whether the document falls within that statute."  *Krikorian*, 984 F.2d at 465.

Moreover, to claim Exemption 3 the Government need not show that there would be any harm to

national security from disclosure, only that the withheld information falls within the purview of

the exemption statute.  *Larson*, 565 F.3d at 868.

In withholding the responsive records, the CIA relies on the National Security Act, 50

U.S.C. § 403-1(i), which protects intelligence sources and methods from unauthorized

disclosure.  Bennett decl. at ¶¶ 32, 34.  The CIA determined that disclosure of the responsive

records would reveal information pertaining to the intelligence methods and activities of the

CIA, as discussed above.  *Id*.  This statute indisputably qualifies as an Exemption 3 statute.  *See,

e.g., ACLU*, 628 F.3d at 619; *Larson*, 565 F.3d at 868.  In *Sims*, 471 U.S. at 180, the Supreme

17

Court, recognizing the wide-ranging authority provided by the National Security Act to protect intelligence sources and methods, held that it was "the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process."  The Court observed that Congress did not limit the scope of "intelligence sources and methods" in any way.  Rather, it "simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the Agency needs to perform its statutory duties with respect to foreign intelligence."  *Id*. at 169-70.  Applying this deferential standard, the CIA has plainly established that the responsive records are protected from disclosure under the National Security Act and Exemption 3.

The CIA also relies on the Central Intelligence Agency Act of 1949, 50 U.S.C. § 403g, as a statutory basis on which to withhold the responsive documents.  Section 403g authorizes the CIA to withhold information pertaining to intelligence methods and activities that is related to the CIA's core functions.  The intelligence methods and activities revealed by the responsive records constitute a core function of the CIA.  Bennett decl. at ¶¶ 33, 34.  It is well established that the CIA Act, like the National Security Act, is an Exemption 3 disclosure statute. *See Halperin*, 629 F.2d at 147.  Accordingly, because the CIA's declaration establishes that the responsive records fall within the terms of statutes mandating the documents be withheld, Exemption 3 provides an additional basis on which to grant the CIA summary judgment.

## CONCLUSION

For all of the foregoing reasons, the Court should grant summary judgment in favor of

the defendant agencies and dismiss plaintiff's amended complaint it its entirety.


Respectfully Submitted,

TONY WEST
Assistant Attorney General

IAN H. GERSHENGORN
Deputy Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

RONALD C. MACHEN JR.
United States Attorney


 /s/ Marcia Berman
ELIZABETH J. SHAPIRO (D.C. Bar No. 418925)
MARCIA BERMAN ((PA Bar No. 66168)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7132
Washington, D.C.  20530
Tel.: (202) 514-2205
Fax: (202) 616-8470
Email: elizabeth.shapiro@usdoj.gov
          marcia.berman@usdoj.gov

Attorneys for Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| | ) | Civil Action No. |
| Plaintiff, | ) | 1:11-cv-00890-JEB |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF DEFENSE, and | ) | |
| CENTRAL INTELLIGENCE AGENCY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## **DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Pursuant to Local Civil Rule 7(h) of the Rules of the United States District Court for the District of Columbia, defendants hereby submit the following statement of material facts as to which defendants contend there is no genuine issue in connection with their motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

1. On May 2, 2011, Judicial Watch sent a request to the CIA and DoD under the FOIA seeking "all photographs and/or video recordings of Osama (Usama) Bin Laden taken during and/or after the U.S. military operation in Pakistan on or about May 1, 2011." Declaration of John Bennett, Director, National Clandestine Service ("NCS"), Central Intelligence Agency, at ¶ 5 and Exhibit A ("Bennett decl."); Declaration of William T. Kammer at ¶ 3 and Exhibit 1 ("Kammer decl.").

2. The agencies both provided interim responses stating that it was unlikely that they would be able to provide substantive responses within the 20-day statutory time period under FOIA. Bennett decl. at ¶ 7 and Exhibit B; Kammer decl. at ¶ 3 and Exhibit 2.

3. The CIA and DoD conducted searches for responsive records. Both agencies

thoroughly searched the components that were most likely to have responsive records related to the May 1, 2011 operation.  Bennett decl. at ¶ 10; Kammer decl. at ¶¶ 4-8.  DoD located no responsive records.  Kammer decl. at ¶¶ 5, 7, 8.

4.  DoD determined that the components likely to have records responsive to plaintiff's request were the Office of the Chairman of the Joint Chiefs of Staff ("OCJCS"), the U.S. Special Operations Command ("USSOCOM"), and the Department of the Navy.  Kammer decl. at ¶ 4. Within the OCJCS, a single action officer in the Directorate for Global Operations maintained all documents related to the May 1, 2011 operation.  This officer searched all hard copy records and the only stand alone computer used to store electronic records, and no responsive records were located.  Additionally, the email files of the Chairman of the Joint Chiefs of Staff, Admiral Mike Mullen, were searched, and no responsive records were located.  *Id*. at ¶ 5.  USSOCOM searched the Headquarters and relevant military service components, and no records responsive to plaintiff's request were located.  *Id*. at ¶¶ 6-7.

5.  Osama bin Laden's body was buried at sea from the U.S. Navy aircraft carrier USS Carl Vinson.  No USS Carl Vinson personnel took any photographs or videos of the burial. Emails in the ship's computers system discussing the operation were reviewed, however, in an effort to identify any mention of responsive photographs or video recordings.  This effort did not reveal evidence of any such photographs or video recordings on the USS Carl Vinson.  Kammer decl. at ¶ 8.

6.  The CIA conducted a similarly reasonable search, *see* Bennett decl. at ¶ 10, which did locate responsive records.  The CIA located a total of fifty-two unique responsive records. Bennett decl. at ¶ 11.  The responsive records contain images of Osama bin Laden's body after

he was killed.  Many are graphic and gruesome, as they depict the fatal bullet wound to bin

Laden's head.  *Id*.  Some of the images were taken inside the compound in Abbottabad, Pakistan,

where bin Laden was killed.  Other images were taken as bin Laden's body was transported from

the Abbottabad compound to the location where he was buried at sea.  *Id*.  Several images depict

the preparation of Osama bin Laden's body for the burial as well as the burial itself.  *Id*.  The

CIA withheld the fifty-two responsive records in their entirety pursuant to FOIA Exemptions 1

and 3.  5 U.S.C. §§  552(b)(1), (3); Bennett decl. at ¶¶ 13-34.  The CIA specifically determined

that no reasonably segregable, non-exempt portions of the responsive records could be released.

Bennett decl. at ¶ 35.

7.  The withheld information was properly classified under Executive Order 13,526, 75

Fed. Reg. 707 (Dec. 29, 2009).  As the agencies' declarations establish, the responsive records

pertain to the following categories of information included in Executive Order 13,526:  military

plans, weapons systems, or operations; intelligence activities and intelligence sources or

methods; and foreign relations or foreign activities of the United States.  Exec. Order No. 13,526

§ 1.4(a), (c), (d); Bennett decl. at ¶¶ 21, 28-29; Declaration of Admiral William H. McRaven at ¶

3 ("McRaven decl.") (redacted version).  "[A]ll of the responsive records are the product of a

highly sensitive, overseas operation that was conducted under the direction of the CIA; accord-

ingly, . . . all of the records pertain to intelligence activities and/or methods as well as the foreign

relations and foreign activities of the United States."  Bennett decl. at ¶ 21.

8.  Certain responsive records pertain to intelligence methods and activities because they

"provid[e] insight into the manner in which the photographs or video recordings were obtained

as well as the purpose, utility, or manner in which the photographs or video recordings could be

used by the CIA and the extent or limitations of such capabilities." Bennett decl. at ¶ 29.  For

example, release of post-mortem photographs taken to conduct facial recognition analysis could

provide insight into the manner in which such analysis is conducted or the extent or limitation of

such analysis.  *Id.*  Release of other images could reveal the types of equipment or other tools

that were utilized (or not) during the execution of a highly sensitive intelligence operation, as

well as information regarding the purpose, extent, or limitations of such tools.  *Id.*  The classified

declaration submitted by Admiral McRaven further explains how the responsive records reveal

information pertaining to military operations, including classified Sensitive Site Exploitation

Tactics, Techniques, and Procedures and the methods that special operations forces use for

identification of captured and killed personnel.  McRaven decl. at ¶ 3 (redacted version); *see also*

Bennett decl. at ¶ 21.

9.  The declarations establish that release of the responsive records reasonably could be

expected to cause harm to the national security of the United States.  The CIA's declarant, John

Bennett, determined that all of the records are properly classified as "Top Secret" because "their

unauthorized disclosure reasonably could be expected to result in exceptionally grave damage to

the national security."  Bennett decl. at ¶ 22; *see also* Exec. Order No. 13,526 § 1.2(a)(1).

10.  The responsive records depict Osama bin Laden after he was killed by U.S. forces,

and many graphically show the fatal bullet wound to bin Laden's head and other gruesome

images.  Bennett decl. at ¶¶ 11, 23.  Mr. Bennett logically determined that release of such

graphic images of Osama bin Laden, the founding father of al-Qa'ida, taken after his death at the

hands of the United States, could reasonably be expected to inflame anti-American sentiment

and provoke deadly attacks on the United States or its citizens abroad.  Al-Qa'ida, which has

4

openly declared war on the United States and is committed to killing innocent Americans, has

vowed to retaliate for the death of its leader, Osama bin Laden.  The mere release of these

images of Osama bin Laden could be interpreted as a deliberate attempt by the United States to

humiliate the late al-Qa'ida leader, which could trigger violence, attacks, or acts of revenge

against the United States.  *Id*. at ¶¶ 23-27.

11.  In addition, "the public release of the responsive records would provide terrorist

groups and other entities hostile to the United States with information to create propaganda

which, in turn, could be used to recruit, raise funds, inflame tensions, or rally support for causes

and actions that reasonably could be expected to result in exceptionally grave damage to both the

national defense and foreign relations of the United States."  *Id*. at ¶ 24.  "Al-Qa'ida has a very

effective propaganda operation," *id*., and it has made such use of information they believe could

be inflammatory before.  For example, information about abuse of Iraqi detainees at the Abu

Ghraib prison was used by al-Qa'ida on extremist websites that recruit jihadists and solicit

financial support.  *Id*.  As explained by Mr. Bennett, there is every reason to believe that al-

Qa'ida would use these images of bin Laden's body to inflame jihadist support and inspire

attacks on the United States.  *Id*.  This belief "is not merely conjectural."  *Id*. at ¶ 25.  In fact, al-

Qa'ida already has used the circumstances surrounding Osama bin Laden's death and burial to

recruit and further its goals.  *Id*. (discussing al-Qa'ida media communications devoted to bin

Laden's "martyrdom" and criticism of his burial).  Thus, Mr. Bennett reasonably determined that

"releasing post-mortem images of [bin Laden] that reflect the gruesome nature of his fatal

injuries, as well as his burial at sea, could enhance al-Qa'ida's efforts to use these events to

further attack and otherwise inflict exceptionally grave damage to the security interests of the

United States."  *Id.*

12.  DoD further determined that release of the responsive records "will pose a clear and grave risk of inciting violence and riots against U.S. and Coalition forces."  Declaration of Robert B. Neller at ¶ 6 ("Neller decl.").  Lieutenant General Neller is the Director of Operations, J-3, on the Joint Staff at the Pentagon.  The J-3 is responsible for all DoD operational matters outside the continental United States.  *Id*. at ¶ 1.  Lt. Gen. Neller based his determination of harm on his years of experience and judgment as well as on past incidents of violence erupting following disclosures that al-Qa'ida used as propaganda.  *Id*. at ¶¶ 6-9.  He concludes, "I believe that the release of the responsive records would reasonably be expected to endanger the lives and physical safety of the approximately 98,000 U.S. troops in Afghanistan, endanger the lives and physical safety of Afghan civilians at large, and police and military personnel of the Government of Afghanistan, aid the recruitment efforts and other activities of insurgent elements, and increase the likelihood of violence against United States interests, personnel and citizens worldwide."  *Id*. at ¶ 9.

13.  Release of the responsive records could also reasonably be expected to harm national security by revealing sensitive information about intelligence methods and activities and military operations.  Release of ceratin photographs and/or video recordings could reveal the manner in which, and purpose for which, they were obtained, or could reveal the types of equipment or other tools that were utilized (or not) during this operation.  The disclosure of such information could allow hostile forces to evade, counter, or replicate the CIA's intelligence methods, thereby limiting their utility or making them obsolete.  Bennett decl. at ¶¶ 28-30.  Once an intelligence method is discovered, its continued successful use is seriously jeopardized.  If information about

a particular intelligence method is disclosed, that information can be used by our adversaries to detect, prevent, or damage U.S. intelligence operations or to advance hostile operations against the United States.  *Id*. at ¶ 28.  Moreover, even seemingly innocuous details contained in the responsive records could be harmful if pieced together with other information by foreign intelligence services.  Bennett decl. at ¶ 29.

14.  Specific explanations of why release of responsive records would undermine national security by revealing sensitive military operations are set forth in the classified declaration of Admiral McRaven.  Admiral McRaven based his conclusions on his years of service and experience in the U.S. military and in special operations units.  McRaven decl. at ¶ 4.  Admiral McRaven describes specifically how the responsive records reveal sensitive information pertaining to military operations, and how their disclosure could reasonably be expected to cause damage to national security.  He concludes that "the official release of the responsive records could reasonably be expected to: (a) make the special operations unit that participated in this operation and its members more readily identifiable in the future; (b) reveal classified Sensitive Site Exploitation Tactics, Techniques, and Procedures and other classified information specific to special operations; and (c) reveal the methods that special operations forces use for identification of captured and killed personnel so that the enemy could develop counter-measures to defeat future military operations."  *Id*. at ¶ 3.

Respectfully Submitted,

TONY WEST
Assistant Attorney General

IAN H. GERSHENGORN
Deputy Assistant Attorney General

7

JOSEPH H. HUNT
Director, Federal Programs Branch

RONALD C. MACHEN JR.
United States Attorney


 /s/ Marcia Berman
ELIZABETH J. SHAPIRO (D.C. Bar No. 418925)
MARCIA BERMAN ((PA Bar No. 66168)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7132
Washington, D.C.  20530
Tel.: (202) 514-2205
Fax: (202) 616-8470
Email: elizabeth.shapiro@usdoj.gov
        marcia.berman@usdoj.gov

Attorneys for Defendants.