UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,                )
                                     )
                                     )
         Plaintiff,                  )
                                     )
    v.                               )     Case No.: 1:11-cv-00890
                                     )
U.S. DEPARTMENT OF DEFENSE,          )
et al.                               )
                                     )
         Defendants.                 )
_____)

DECLARATION OF JOHN BENNETT
DIRECTOR, NATIONAL CLANDESTINE SERVICE
CENTRAL INTELLIGENCE AGENCY

    I, JOHN BENNETT, hereby declare and state:

    1.    I am the Director of the National Clandestine Service

("NCS") of the Central Intelligence Agency ("CIA" or "Agency").

I was appointed to this position in July 2010.  I joined the

Agency in 1981 and have over twenty-five years of experience as

a CIA officer.  Over the course of my career, I have held a

variety of leadership positions with the Agency, including Chief

of the Special Activities Division and Deputy Chief of the

Africa Division.  Most of my career with the CIA has been spent

in overseas operational positions, including my four tours as

the Chief of overseas CIA Stations.

    2.    The NCS is the organization within the CIA responsible

for conducting the CIA's foreign intelligence and

counterintelligence activities.  As Director of the NCS, it is
my responsibility to oversee its mission of strengthening the
national security and foreign policy objectives of the United
States through the clandestine collection of human intelligence,
technical collection, and Covert Action.  One of the additional
responsibilities that comes with this position is the authority
to assess the current, proper classification of CIA information
based on the classification criteria of Executive Order 13526.
Pursuant to the original TOP SECRET classification authority
that has been delegated to me, I am authorized to make original
classification and declassification decisions.  When called upon
to exercise this authority, I ensure that any determinations
regarding the classification of CIA information are proper and
that the public release of such information does not jeopardize
the national security by disclosing classified intelligence
activities, methods, or operational targets, or endanger United
States government personnel, facilities, or sources.

     3.   I am submitting this declaration in support of the
government's motion for summary judgment in this proceeding.
Through the exercise of my official duties, I have become
familiar with this civil action, the underlying Freedom of
Information Act ("FOIA") request, and the responsive records
described below.  I make the following statements based upon my

personal knowledge and information made available to me in my
official capacity.

4.    The purpose of this declaration is to describe, to the
greatest extent possible on the public record, the bases for my
determination that the responsive CIA records in this case
cannot be publicly disclosed.[1]  This declaration is divided into
three sections.  First, I describe the Plaintiff's FOIA request
and the CIA's response.  Second, I describe the CIA records that
are at issue in this case, each of which I have personally
reviewed.  Third, I set forth the reasoning for my determination
that the responsive records are protected from disclosure
pursuant to FOIA exemptions (b)(1) and (b)(3) because they
contain information pertaining to classified CIA intelligence
activities and methods, sensitive military operations and plans,
and the foreign activities of the United States, the release of
which reasonably could be expected to cause exceptionally grave
damage to the national defense and foreign relations of the
United States.  This conclusion is based on, among other things,
my over twenty-five years of experience with the CIA, including
my extensive service in hostile overseas environments; my
knowledge of the 1 May 2011 operation that killed Usama Bin
Laden ("UBL") and the responsive records in this case that are

---

[1]  At the Court's request, the CIA is prepared to supplement this unclassified
declaration with a classified declaration containing additional information
that the CIA cannot file on the public record.

related to that operation; and my experience in countering the current threat that the United States faces from al-Qa'ida and other hostile groups around the world.

## PLAINTIFF'S FOIA REQUEST AND THE CIA'S RESPONSE

5.    On 5 May 2011, the CIA received a FOIA request from Judicial Watch, Inc. ("Plaintiff"), for "all photographs and/or video recordings of Osama (Usama) Bin Laden taken during and/or after the U.S. military operation in Pakistan on or about May 1, 2011."  A true and correct copy of the request is attached to this declaration as Exhibit A.  The CIA has interpreted Plaintiff's request as referring to the operation conducted by the United States that resulted in the death of Usama bin Laden on or about 1 May 2011.[2]

6.    On 13 May 2011, Plaintiff filed a complaint in the United States District Court for the District of Columbia against the U.S. Department of Defense ("DoD"), which had also received the same FOIA request from Plaintiff.

7.    On 23 May 2011, the CIA sent Plaintiff a letter acknowledging receipt of Plaintiff's FOIA request and advised that it would be processed in accordance with the FOIA.  A true and correct copy of the letter is attached to this declaration as Exhibit B.

---

[2]  This operation occurred on 2 May 2011 in Pakistan.  Due to the difference in time zones, it was 1 May 2011 in the United States.

4

8.   On 8 June 2011, Plaintiff filed an amended complaint adding the CIA as a defendant.

9.   On 28 July 2011, DoD and CIA filed an answer to Plaintiff's amended complaint.

10.   In response to Plaintiff's FOIA request, the CIA conducted a search reasonably calculated to locate records responsive to Plaintiff's request for all photographs and/or video recordings taken of UBL on or about 1 May 2011.   The search was conducted by CIA employees who have access to the pertinent CIA records and who are qualified by training or practice to search those records for information in the course of their professional duties.   The search specifically included the records systems of the CIA components most likely to have records related to the 1 May 2011 operation described below. Given the nature of the operation and the close proximity in time between the operation and Plaintiffs' FOIA request, the CIA was able to determine with particularity which components were most likely to have responsive records.   Based on my knowledge of the CIA's records systems and the search that was conducted, I have determined that the CIA searched the records systems likely to contain records responsive to Plaintiff's FOIA request.

## THE RESPONSIVE RECORDS AT ISSUE

11.  As a result of this search, the CIA located a total of fifty-two (52) unique records that are responsive to Plaintiff's FOIA request.  These records are photographs and/or video recordings taken of UBL on or about 1 May 2011, the day that the United States conducted an operation that resulted in his death. These records contain post-mortem images of UBL's body.  As a result, many of them are quite graphic, as they depict the fatal bullet wound to UBL's head and other similarly gruesome images of his corpse.  Many of the images were taken inside of UBL's compound in Abbottabad, Pakistan, in which he was killed, while others were taken as his corpse was being transported from the Abbottabad compound to the location where he was ultimately buried at sea.  Several other images depict the preparation of his body for burial as well as the burial itself.  Some of the responsive photographs were taken so that the CIA could conduct a facial recognition analysis in order to confirm that the body of the deceased individual was that of UBL.  The CIA's facial recognition technology, which is highly classified, compares unique facial features, such as bone structure, age spots, hair growth patterns, and the size and shape of the eyes, ears, and nose, as well as the relative positioning of facial features. The CIA compared historical photographs of UBL with some of

6

these responsive photographs and concluded with high confidence that the deceased individual was in fact UBL.

12. As described below, these responsive records reflect information pertaining to classified CIA intelligence activities and methods, as well as information pertaining to classified military plans and operations and sensitive foreign activities of the United States. I have determined that the public release of these records reasonably could be expected to cause exceptionally grave damage to the national security of the United States. In addition, because of the highly classified nature of these images, I cannot further describe their contents or the circumstances in which they were obtained on the public record without potentially causing harm to national security. Among other things, release of additional descriptive information concerning the responsive records could expose whether the CIA utilized certain intelligence methods, equipment, tools, technical capabilities, or other operational methods in the course of and immediately after effectuating this highly sensitive operation.

## THE BASES FOR WITHHOLDING THE RESPONSIVE RECORDS PURSUANT TO FOIA EXEMPTIONS (b)(1) AND (b)(3)

### I.   FOIA Exemption (b)(1)

13. The authority to classify information is derived from a succession of Executive Orders, the most recent of which is

Executive Order 13526 ("Order").  FOIA exemption (b)(1), 5

U.S.C. § 552(b)(1), provides that the FOIA does not apply to

matters that are: (a) specifically authorized under criteria

established by an Executive Order to be kept secret in the

interest of national defense or foreign policy; and (b) are in

fact properly classified pursuant to such Executive Order.  5

U.S.C. § 552(b)(1).  As described below, I have determined that

the responsive records at issue in this case are currently and

properly classified in accordance with the substantive and

procedural requirements of Executive Order 13526, thereby making

them exempt from disclosure under FOIA exemption (b)(1).

        14.  Section 1.3(a) of the Order provides that the

authority to classify information originally may be exercised

only by the President, the Vice President, agency heads and

officials designated by the President, and United States

Government officials delegated authority pursuant to section

1.3(c).  Section 1.3(c)(3) provides that TOP SECRET original

classification authority may be delegated only by the President,

the Vice President, or any agency head or official designated

pursuant to section 1.3(a)(2).

        15.  In accordance with section 1.3(a)(2) of the Order, the

President designated the Director of the CIA as an official who

may classify information originally as TOP SECRET.[3]  Section

1.3(b) of the Order provides that original TOP SECRET

classification authority includes the authority to classify

information originally as SECRET and CONFIDENTIAL.

16.  Section 6.1(i) of the Order defines "classified

national security information" or "classified information" as

"information that has been determined pursuant to this order or

any predecessor order to require protection against unauthorized

disclosure and is marked to indicate its classified status when

in documentary form."  Section 6.1(cc) of the Order defines

"national security" as the "national defense or foreign

relations of the United States."

17.  Section 1.1(a) of the Order provides that information

may be originally classified under the terms of this Order only

if all of the following conditions are met:   (1) an original

classification authority is classifying the information;  (2) the

information is owned by, produced by or for, or is under the

control of the United States Government;  (3) the information

falls within one or more of the categories of information listed

in section 1.4 of the Order;  and (4) the original classification

authority determines that the unauthorized disclosure of the

information reasonably could be expected to result in some level

---

[3]  Order of President, Original Classification Authority, 75 Fed. Reg. 735
(Jan. 5, 2010).

of damage to the national security and the original

classification authority is able to identify or describe the

damage.

18.   *Original Classification Authority.*   Pursuant to

section 1.3(c)(2) of the Order, the Director of the CIA has

delegated original TOP SECRET classification authority to me.

As an original classification authority, I am authorized to

conduct classification reviews and to make original

classification decisions.

19.   *U.S. Government Information.*   Information may be

originally classified only if the information is owned by,

produced by or for, or is under the control of the United States

Government.   The information responsive to Plaintiff's FOIA

request is information that is owned by or under the control of

the United States Government.

20.   *Proper Purpose.*   In accordance with Section 1.7(a) of

this Order, I have determined that no information concerning the

records responsive to Plaintiff's FOIA request has been

classified in order to conceal violations of law, inefficiency,

or administrative error; prevent embarrassment to a person,

organization or agency; restrain competition; or prevent or

delay the release of information that does not require

protection in the interests of national security.

21.   *Categories in Section 1.4 of the Executive Order.*
Executive Order 13526 addresses classification of information
relating to intelligence and national security.  Section 1.4(c)
provides that information shall be classified only when it
pertains to, *inter alia*, information concerning "intelligence
activities (including covert action), intelligence sources or
methods, or cryptology."  Section 1.4(d) provides that
information regarding "foreign relations or foreign activities
of the United States" may be classified.  In this case, all of
the responsive records are the product of a highly sensitive,
overseas operation that was conducted under the direction of the
CIA; accordingly, I have determined that all of the records
pertain to intelligence activities and/or methods as well as the
foreign relations and foreign activities of the United States.
I further describe this information and its relation to the
national security below.  In addition, while the records
responsive to Plaintiff's FOIA request belong to the CIA, the
responsive records also reveal information concerning "military
plans, weapons systems, or operations" that are classified
pursuant to Section 1.4(a).  These DoD equities will be further
addressed in the declarations of Admiral William H. McRaven and
Lieutenant General Robert B. Neller, which are also being filed
in support of the government's motion for summary judgment in
this proceeding.

22.   *Damage to National Security*.   Section 1.2(a) of the
Order provides that information shall be classified at one of
three levels if the unauthorized disclosure of the information
reasonably could be expected to cause damage to the national
security, and the original classification authority is able to
identify or describe the damage.   Information shall be
classified TOP SECRET if its unauthorized disclosure reasonably
could be expected to result in *exceptionally grave damage* to the
national security; SECRET if its unauthorized disclosure
reasonably could be expected to result in *serious damage* to the
national security; and CONFIDENTIAL if its unauthorized
disclosure reasonably could be expected to result in *damage* to
the national security.   Consistent with the Order, I have
determined that all of the responsive records are classified TOP
SECRET because their unauthorized disclosure reasonably could be
expected to result in exceptionally grave damage to the national
security.   I further describe this exceptionally grave damage
below.   In addition to the description set forth below, I also
refer the Court to the declarations of Admiral McRaven and
Lieutenant General Neller, which I have relied upon and which
further describe how the unauthorized disclosure of information
in the responsive records relating to DoD equities reasonably
could be expected to cause harm to the national security.

12

a.   **Harm to National Security from Release of Images of UBL**

23.   In this case, the responsive records contain images of UBL's body after he was killed.  These post-mortem images of the former leader of al-Qa'ida include photographs of the gun-shot wound to his head.  In short, these pictures are gruesome.  As a result, the release of these graphic photographs and other images of UBL's corpse reasonably could be expected to inflame tensions among overseas populations that include al-Qa'ida members or sympathizers, encourage propaganda by various terrorist groups or other entities hostile to the United States, or lead to retaliatory attacks against the United States homeland or United States citizens, officials, or other government personnel traveling or living abroad.  Therefore, I have determined that releasing images of UBL taken during and/or after the 1 May 2011 operation reasonably could be expected to cause exceptionally grave damage to the national defense and foreign relations of the United States.  As such, all of the records responsive to Plaintiff's request are properly classified as TOP SECRET and are therefore exempt from disclosure pursuant to FOIA exemption (b)(1).  In reaching this determination, I was mindful of President Obama's statement that "given the graphic nature of these photos, [releasing them] would create some national security risk," as they might be used

13

as "an incitement to additional violence [or] a propaganda
tool."

24.  More specifically, the public release of the
responsive records would provide terrorist groups and other
entities hostile to the United States with information to create
propaganda which, in turn, could be used to recruit, raise
funds, inflame tensions, or rally support for causes and actions
that reasonably could be expected to result in exceptionally
grave damage to both the national defense and foreign relations
of the United States.  Al-Qa'ida has a very effective propaganda
operation.  For example, when abuse of Iraqi detainees at the
Abu Ghraib prison was disclosed, al-Qa'ida made very effective
use of that information on extremist websites that recruit
jihadists and solicit financial support.  Similarly, post-mortem
images of UBL would provide encouragement and ready-made
ammunition for al-Qa'ida propaganda which could lead to violence
and deadly attacks against the United States homeland or United
States citizens, officials, or other government personnel
traveling or living abroad.

25.  The damage to the United States national security that
could result through the public disclosure of the responsive
records is not merely conjectural.  Indeed, since UBL's death,
al-Qa'ida has already attempted to use the circumstances
surrounding his death and burial as propaganda to recruit and

14

further its goal of harming the United States.  For instance,
the summer 2011 edition of Inspire Magazine, an English-language
online magazine published by al-Qa'ida in the Arabian Peninsula
("AQAP"), included an article devoted to the so-called
"martyrdom" of UBL.  In addition, Ayman Al-Zawahiri, the current
al-Qa'ida leader, released a video in June 2011 eulogizing UBL.
In the video, Zawahiri attacked the United States' assertions
that UBL received an appropriate Islamic burial at sea.  Thus,
releasing post-mortem images of UBL that reflect the gruesome
nature of his fatal injuries, as well as his burial at sea,
could enhance al-Qa'ida's efforts to use these events to further
attack and otherwise inflict exceptionally grave damage to the
security interests of the United States.

        26.  The public release of graphic, post-mortem images of
UBL could also generate fodder for extremist commentary that
could further incite attacks against the United States and its
citizens.  For instance, although the United States military
took cautionary steps in producing deceased al-Qa'ida in Iraq
(or "AQI") leader Abu Musab al-Zarqawi's posthumous image
through cleaning the body, foreign editorials criticized the
released by labeling the photo a "trophy."  Editorials in
Pakistan also portrayed the repeated rebroadcasts of the photo
as an "ad for jihad" that was broadcast around the world.  In
this case, such controversy relating to release of the UBL

images could similarly be used by al-Qa'ida or other hostile entities as propaganda to recruit jihadists, solicit financial support, or encourage attacks against the United States.

27.  Moreover, the release of graphic and posthumous images of UBL, including images of his burial, could be interpreted as a deliberate attempt by the United States to humiliate the late al-Qa'ida leader.  For example, media scenes involving photos of UBL juxtaposed against scenes of celebration in the United States could cause feelings of denigration and could trigger violence, attacks, or acts of revenge against the United States homeland or its citizens, officials, or other government personnel living or traveling overseas.  Accordingly, I have determined that disclosure of the responsive records reasonably could be expected to cause exceptionally grave damage to the United States.  Therefore, the responsive records are properly classified as TOP SECRET and thus protected from disclosure pursuant to FOIA exemption (b)(1).

   **b.   Harm to National Security from Release of Information Pertaining to CIA Intelligence Activities and Methods**

28.  In addition to the harm described above, which applies to all of the responsive images, additional harm to national security could be caused by the fact that release of certain responsive records could also reveal intelligence activities and methods that were employed during or after the operation.

16

Generally speaking, intelligence methods are the means by which the CIA accomplishes its mission, while intelligence activities embody the operational implementation of such methods. Intelligence methods include the basic business practices and methodological "tools" used by the CIA to accomplish its mission. The term "intelligence methods" is not limited to sophisticated techniques and electronic devices. "Intelligence methods" also include, among other things, seemingly innocuous facts such as where the CIA operates or has operated and how long the CIA operated in a particular part of the world. Once an intelligence method (or the fact of its use in a certain situation) is discovered, its continued successful use by the CIA is seriously jeopardized. If information about a particular intelligence method is disclosed, that information can also be used by adversaries of the United States to detect, prevent, or damage U.S. intelligence operations or to advance affirmative hostile operations against the United States. For similar reasons, the CIA must protect from public disclosure not only the information about the intelligence methods that it utilizes, but also information that reveals methods the CIA does not use, as this may indicate a potential weakness or vulnerability in the CIA's operations or capabilities.

29. In this case, the release of certain responsive records would reveal information about intelligence methods and

activities by providing insight into the manner in which the photographs or video recordings were obtained as well as the purpose, utility, or manner in which the photographs or video recordings could be used by the CIA and the extent or limitations of such capabilities. By way of example, release of post-mortem photographs of UBL that were used to conduct facial recognition analysis could provide insight into the manner in which such analysis is conducted or the extent or limitation of such analysis. Release of other images could similarly reveal the types of equipment or other tools that were utilized (or not) during the execution of a highly sensitive intelligence operation, as well as information regarding the purpose, extent, or limitations of such tools. Such disclosures could allow hostile governments, intelligence agencies, and other adversaries to take steps to evade, counter, or replicate the CIA's intelligence collection methods, thereby limiting their utility or rendering them obsolete. Moreover, even seemingly innocuous details contained in the responsive records could be harmful if publicly disclosed. Foreign intelligence services specialize in collecting information from many sources and draw conclusions from all of the information gathered. While information in isolation may seem innocuous on its face, it can nonetheless be combined with similar information which could

18

further expose intelligence methods and assist in efforts to uncover, evade, or counter such methods or capabilities.

30.   Because insight into the intelligence methods and activities associated with the 1 May 2011 operation could assist those who wish to detect, evade, replicate, or counter such methods, I have determined that disclosure of certain responsive records reasonably could be expected to result in exceptionally grave damage to the national security.  As such, these responsive records are properly classified and therefore exempt from disclosure pursuant to FOIA exemption (b)(1).

**II.   FOIA Exemption (b)(3)**

31.   FOIA exemption (b)(3), 5 U.S.C. § 552(b)(3), provides that the FOIA disclosure provisions do not apply to matters that are specifically exempted from disclosure by statute, provided that such statute: (a) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (b) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

32.   *National Security Act of 1947*.  Section 102A(i)(1) of the National Security Act, as amended, provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure." Accordingly, the National Security Act constitutes a federal

19

statute which "requires that the matters be withheld from the
public in such a manner as to leave no discretion on the issue."
5 U.S.C. § 552(b)(3). Under the direction of the DNI pursuant to
section 102A, and consistent with section 1.6(d) of Executive
Order 12333,[4] the CIA is authorized to protect CIA sources and
methods from unauthorized disclosure. As described above, I
have determined that disclosure of the responsive records would
reveal information pertaining to the intelligence methods and
activities of the CIA. Therefore, the responsive records are
protected from public disclosure by the National Security Act
and FOIA exemption (b)(3).

33. *Central Intelligence Agency Act of 1949.* Section 6 of
the CIA Act, as amended, provides:

> In the interests of the security of the foreign
> intelligence activities of the United States and in
> order to further implement section 403-1(i) of this
> title that the Director of National Intelligence shall
> be responsible for protecting intelligence sources and
> methods from unauthorized disclosure, the . . . [CIA]
> shall be exempted from . . . the provisions of any
> other law which require the publication or disclosure
> of the organization, functions, names, official
> titles, salaries, or numbers of personnel employed by
> the Agency.

50 U.S.C. § 403g. As one of the CIA's primary functions is to
collect intelligence through human sources and by other

---

[4] Section 1.6(d) of Executive Order 12333, as amended, 3 C.F.R. 200 (1981),
reprinted in 50 U.S.C.A. § 401 note at 25, and as amended by Executive Order
13470, 73 Fed. Reg. 45,323 (July 30, 2008), requires the Director of the
Central Intelligence Agency to "[p]rotect intelligence and intelligence
sources, methods, and activities from unauthorized disclosure...."

appropriate methods, Section 6 of the CIA Act authorizes the CIA
to withhold information pertaining to intelligence methods and
activities that is related to the CIA's core functions.  In this
case, the information described above concerning the CIA's
intelligence methods and activities is specifically protected
from disclosure by the CIA Act because such methods and
activities constitute a core function of the CIA.

    34.  Accordingly, the responsive records are subject to the
protections of both the National Security Act and the CIA Act
and are therefore exempt from disclosure pursuant to FOIA
exemption (b)(3).  In contrast to Executive Order 13526, the
CIA's statutory requirements under the National Security Act and
the CIA Act to further protect intelligence methods are absolute
and do not require the CIA to identify or describe the harm to
the national security that reasonably could be expected to
result from their unauthorized disclosure.  Nonetheless, the
information withheld pursuant to exemption (b)(3) is the same as
the information described above relating to intelligence methods
and activities withheld pursuant to exemption (b)(1).  Thus, its
disclosure reasonably could be expected to result in
exceptionally grave damage to the national security of the
United States.

35.  *Segregability Analysis*.  Finally, I conducted a careful review of each responsive record to ensure the information was properly withheld pursuant to the FOIA exemptions as outlined above.  Any non-exempt information in the responsive records is so inextricably intertwined with any exempt information that there are no meaningful, reasonably segregable, non-exempt portions.  Accordingly, I have determined that the responsive records must be withheld in full.

CONCLUSION

36.  Disclosure of the responsive records in this case reasonably could be expected to cause exceptionally grave damage to the national security of the United States, and the records are therefore exempt from disclosure pursuant to FOIA exemption (b)(1).  In addition, such records are subject to the protections of the National Security Act and the CIA Act and are therefore exempt from disclosure pursuant to FOIA exemption (b)(3).

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of September 2011.

John Bennett
Director, National Clandestine Service
Central Intelligence Agency

22

# EXHIBIT A

C05664554

CUL DUT 2021   11:07    202646019R      UNCLASSIFIED
                                      JUDICIAL WATCH                        PAGE  02/t



**Judicial Watch®**

*Because no one
is above the law!*

F-2011-01345

May 4, 2011

**VIA CERTIFIED MAIL & FACSIMILE (703-613-3007)**

Information and Privacy Coordinator
Central Intelligence Agency
Washington, DC  20505

**Re:  Freedom of Information Act Request**

Dear Freedom of Information Officer:

Pursuant to the provisions of the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests that the Central Intelligence Agency produce, within twenty (20) business days, all photographs and/or video recordings of Osama (Usama) Bin Laden taken during and/or after the U.S. military operation in Pakistan on or about May 1, 2011.

If any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient information identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material. 5 U.S.C. § 552(b).

Judicial Watch also requests a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii). Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media. Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). In addition, if records are not produced within twenty (20) business days, Judicial Watch is entitled to a complete waiver of search and duplication fees under the OPEN Government Act of 2007, Section 6(b).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch's ongoing efforts to document the operations and activities of the federal government and to educate the public about these operations and activities. Once Judicial Watch obtains the requested records, it intends to analyze them and disseminate the results of its

425 Third St., SW, Suite 800, Washington, DC 20024 • Tel: (202) 646-5172 or 1-888-593-8442
FAX: (202) 646-5199 • Email: info@JudicialWatch.org • www.JudicialWatch.org

C05664554   11:07     2826460198          **UNCLASSIFIED** JUDICIAL WATCH          PAGE  03/0

May 4, 2011
Page 2 of 2

analysis, as well as the records themselves. It also will make the records available to other members of the media or researchers upon request. Judicial Watch has a proven ability to disseminate information obtained through FOIA to the public.

Given these circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

In an effort to facilitate record production within the statutory time limit, Judicial Watch is willing to accept documents in electronic format (e.g. e-mail, .pdfs). When necessary, Judicial Watch will also accept the "rolling production" of documents.

If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172 or mbekesha@judicialwatch.org. Thank you for your cooperation.

Sincerely,

Michael Bekesha
Judicial Watch, Inc.

# EXHIBIT B

Central Intelligence Agency



Washington, D.C. 30505

23 May 2011

Mr. Michael Bekesha
Judicial Watch, Inc.
425 Third Street, SW
Suite 800
Washington, D.C.  20024

Reference:  F-2011-01345

Dear Mr. Bekesha:

On 4 May 2011, the office of the Information and Privacy Coordinator received your 4 May 2011 Freedom of Information Act (FOIA) request on behalf of Judicial Watch, Inc., for: **"all photographs and/or video recordings of Osama (Usama) Bin Laden taken during and/or after the U.S. military operation in Pakistan on or about May 1, 2011."** We have assigned your request the reference number above. Please use this number when corresponding so that we can identify it easily.

We accept your request and will process it in accordance with the FOIA, 5 U.S.C. § 552, as amended, and the CIA Information Act, 50 U.S.C. § 431, as amended, and will search for responsive records existing through the date of this acceptance letter. As a matter of administrative discretion, and in accordance with our regulations, the Agency has waived the fees for this request.

The large number of FOIA requests CIA receives has created unavoidable delays making it unlikely that we can respond within the 20 working days the FOIA requires. You have the right to consider our honest appraisal as a denial of your request and you may appeal to the Agency Release Panel. A more practical approach would permit us to continue processing your request and respond to you as soon as we can. You will retain your appeal rights and, once you receive the results of our search, can appeal at that time if you wish. We will proceed on that basis unless you object.

Sincerely,

Susan Viscuso
Information and Privacy Coordinator