**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-00890 (JEB) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF DEFENSE, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Judicial Watch, Inc., by counsel and pursuant to Rule 56(c) of the Federal Rules of

Civil Procedure, hereby cross-moves for summary judgment against Defendants U.S. Department

of Defense and Central Intelligence Agency.   As grounds therefor, Plaintiff respectfully refers the

Court to the accompanying Plaintiff's Memorandum of Law in Opposition to Defendants' Motion

for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment and

Plaintiff's Response to Defendants' Statement of Material Facts Not in Dispute and Plaintiff's

Statement of Material Facts in Support of Cross-Motion for Summary Judgment.

Dated: December 14, 2011

Respectfully submitted,

<u>/s/ Michael Bekesha</u>
D.C. Bar No. 995749
JUDICIAL WATCH, INC.
425 Third Street S.W., Suite 800
Washington, DC 20024
(202) 646-5172

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-00890 (JEB) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF DEFENSE, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT; REQUEST FOR HEARING**

Paul J. Orfanedes
D.C. Bar No. 429716
Michael Bekesha
D.C. Bar No. 995749
JUDICIAL WATCH, INC.
425 Third Street S.W., Suite 800
Washington, DC 20024
(202) 646-5172

*Counsel for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................... iii

MEMORANDUM OF LAW .........................................................................................1

I.       INTRODUCTION .............................................................................................1

II.      FACTUAL BACKGROUND .............................................................................3

         A.      Public Information on the May 1, 2011 Raid on
                 Osama bin Laden's Compound................................................................3

         B.      Public Information on the Content of and the Decision to
                 Release Post Mortem Photographs and Video Recordings of
                 Osama bin Laden ....................................................................................5

         C.      Executive Order 13526 Establishes a Uniform System
                 for Classifying National Security Information ......................................12

III.     SUMMARY OF THE ARGUMENT ...............................................................14

IV.      ARGUMENT...................................................................................................15

         A.      Defendants' Search for and Decision to Withhold All 52
                 Records Are Reviewed *De Novo* ..........................................................15

         B.      Defendants Fail to Demonstrate that They Conducted an
                 Adequate Search for Responsive Records .............................................15

         C.      Defendants' *Vaughn* Declarations Are Inadequate................................18

         D.      Defendants Fail to Demonstrate that All 52 Records Are Being Properly
                 Withheld under Exemption 1 .................................................................22

                 1.      Defendants fail to demonstrate that they have complied with the
                         classification procedures of EO 13526 ......................................23

                 2.      Defendants fail to demonstrate that all 52 records conform to
                         EO 13526's substantive criteria for classification .....................27

i

a.      Defendants fail to demonstrate that all 52 records
        pertain to one or more of the classification categories
        of EO 13526, § 1.4 ................................................................... 28

b.      Defendants fail to demonstrate that all 52 records
        reasonably could be expected to cause identifiable
        or describable exceptionally grave damage to the
        national security .......................................................................... 34

E.      Defendants Fail to Demonstrate that All 52 Records Are Being Properly
        Withheld under Exemption 3 ................................................................ 43

V.      CONCLUSION ................................................................................................ 44

## TABLE OF AUTHORITIES

**Cases**

*ACLU v. U.S. Department of Defense*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) ..........................37

*ACLU v. U.S. Department of Defense*, 628 F.3d 612 (D.C. Cir. 2011) ................................27, 40

*Allen v. Central Intelligence Agency*, 636 F.2d 1287 (D.C. Cir. 1980) ................................ 26-27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................15

\* *Campbell v. U.S. Department of Justice*,
    164 F.3d 20 (D.C. Cir. 1998) ..................................................22, 28, 31, 33-34, 39, 41-42

*Campbell v. U.S. Department of Justice*, 231 F. Supp. 2d 1 (D.D.C. 2002) ...............................19

*Coastal States Gas Corporation v. U.S. Department of Energy*,
    617 F.2d 854 (D.C. Cir. 1980) ................................................................................................18

*Council for a Livable World v. U.S. Department of State*,
    96-CV-1807, 1998 U.S. Dist. LEXIS 23643 (D.D.C. Nov. 23, 1998) ............................27

*Dellums v. Powell*, 642 F.2d 1352 (D.C. Cir. 1980) ...................................................................18

*Fitzgibbon v. Central Intelligence Agency*, 911 F. 2d 755 (D.C. Cir. 1990) .............................43

\* *International Counsel Bureau v. U.S. Department of Defense*,
    723 F. Supp. 2d 54 (D.D.C. 2010) ................................... 22, 28, 29, 31, 34, 39, 41-42, 44

*James Madison Project v. Central Intelligence Agency*,
    605 F. Supp. 2d 99 (D.D.C. 2009) ........................................................................................43

*Judicial Watch, Inc. U.S. Postal Service*, 297 F. Supp. 2d 252 (D.D.C. 2004) .........................15

*Judicial Watch, Inc. v. Food and Drug Administration*,
    449 F.3d 141 (D.C. Cir. 2006) ...............................................................................................18

\* *King v. U.S. Department of Justice*, 830 F.2d 210 (D.C. Cir. 1987) ............................. 18-22, 27

*Larson v. U.S. Department of State*, 565 F.3d 857 (D.C. Cir. 2009) ....................................22, 27

iii

*Lesar v. U.S. Department of Justice*, 636 F.2d 472 (D.C. Cir. 1980)  ...........................................23

*Mead Data Central, Inc. v. U.S. Department of the Air Force*,
    566 F.2d 242 (D.C. Cir. 1977)  ..............................................................................18, 22

*Morley v. Central Intelligence Agency*, 508 F.3d 1108 (D.C. Cir. 2007)  ....................................43

* *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885 (D.C. Cir. 1995)  ......................... 15-17

*Paisley v. Central Intelligence Agency*, 712 F.2d 686 (D.C. Cir. 1983)  ................................ 18-19

*Shoenman v. Federal Bureau of Investigation*,
    575 F. Supp. 2d 136 (D.D.C. 2008)  ...............................................................................23

*Steinberg v. U.S. Department of Justice*, 23 F.3d 548 (D.C. Cir. 1994)  .....................................18

*Summers v. U.S. Department of Justice*, 140 F.3d 1077 (D.C. Cir. 1998) ....................................31

* *Sussman v. U.S. Marshals Service*, 494 F.3d 1106 (D.C. Cir. 2007)  ..................... 31-32, 42, 44

*Truitt v. U.S. Department of State*, 897 F.2d 540 (D.C. Cir. 1990)  ............................................15

*Washington Post v. U.S. Department of Defense*, 766 F. Supp. 1 (D.D.C. 1991)  ......................23

*Weisberg v. U.S. Department of Justice*, 745 F.2d 1476 (D.C. Cir. 1984)  ...........................15, 18

## Rules, Statutes, and Executive Orders

5 U.S.C. § 552(b)(1)  ...................................................................................................................22

5 U.S.C. § 552(b)(3)  ...................................................................................................................43

* Executive Order 13526, 3 C.F.R. 707 (2010)  .............................................12-14, 24, 26-27, 34

Fed.R.Civ.P. 56(c)  .....................................................................................................................15

Plaintiff Judicial Watch, by counsel, respectfully submits this memorandum in opposition to Defendants' motion for summary judgment and in support of Plaintiff's cross-motion for summary judgment.   In addition, pursuant to LCvR 7(f), Plaintiff requests an oral hearing on Defendants' motion for summary judgment and Plaintiff's cross-motion for summary judgment. As grounds therefor, Plaintiff states as follows:

<u>**MEMORANDUM OF LAW**</u>

I.     **INTRODUCTION.**

Following President Obama's announcement that American forces killed Osama bin Laden and took custody of his body and confirmation that photographs and video recordings were taken of bin Laden, Judicial Watch, along with numerous news organizations, filed Freedom of Information Act ("FOIA") requests with the government for copies of such photographs and video recordings.   As with other significant events of the past 100 years, news organizations sought a visual record of this historic event.   Based on various accounts, considerable debate occurred within the government as to how to respond to the FOIA requests.   Eventually, the American people were told that a decision was made by the President.   The photographs would not be released.   However, what has been ignored and glossed over are the well-defined requirements of FOIA.

Based on the declarations submitted by Defendants U.S. Department of Defense ("DoD") and Central Intelligence Agency ("CIA") (collectively "Defendants"), Defendants are not entitled to summary judgment because they have failed to satisfy even the most basic requirements of FOIA.   Defendants have not presented sufficient evidence that an adequate search for records was conducted.   Nor have they provided any evidence of whether the withheld records are

1

photographs or video recordings, accounted for the various circumstances in which the records were created, or sufficiently correlated specific claims of exemption to particular records or categories of records.   In addition, Defendants inexplicably fail to demonstrate that the records were properly classified pursuant to President Obama's Executive Order.   For these reasons, Defendants' motion for summary judgment should be denied, and Defendants should be ordered to provide sufficient evidence to satisfy their burdens under FOIA.

In addition, Plaintiff is entitled to summary judgment because regardless of whether Defendants are able to provide adequate declarations and sufficient evidence, Defendants, at least with respect to some of the records, cannot legally justify their claims of exemption.   Plaintiff does not seek the production of any photographs or video recordings that have been properly classified or would actually cause harm to the national security by revealing intelligence methods or the identity of U.S. personnel or classified technology.   Plaintiff solely seeks those records that have not been properly classified as well as those records for which no military or intelligence secrets would be revealed.

Under FOIA, Plaintiff and the American people have a right to these historical artifacts to capture this moment.   To date, the government has failed to provide a legally sufficient justification for why such records must not be released.   Therefore, the government must be held accountable.   The law requires it.

## II.      FACTUAL BACKGROUND.

### A.      Public Information on the May 1, 2011 Raid on Osama bin Laden's Compound.[1]

On May 1, 2011, President Obama ordered the now-historic raid on Osama bin Laden's compound in Abbottabad, Pakistan.   The mission, officially named Operation Neptune Spear, commenced at 1:22 p.m. when Leon Panetta, then-Director of the CIA, gave word of the President's orders to Admiral William H. McRaven, Commander of the United States Special Operations Command.   At approximately 3:00 p.m., President Obama joined members of his national security team in the Situation Room to monitor the raid.   According to sources, those present watched night-vision images taken from a drone while Director Panetta narrated the mission.

The raid was carried out by approximately two dozen helicopter-borne United States Navy SEALs from the Red Squadron of the Joint Special Operations Command's United States Naval Special Warfare Development Group (DEVGRU).   They operated in two teams and were reportedly equipped with Heckler & Koch 416 carbine military assault rifles (with attached suppressors), night-vision goggles, body armor and handguns.   The two teams originated at the Bagram Airbase in northeastern Afghanistan and flew into Pakistan in two modified Black Hawk helicopters.   According to media reports, the helicopters had never been publicly seen prior to the mission.

Once the SEALs entered Pakistan, the helicopters landed outside the compound and the SEALs scaled the walls to get inside.   The SEALs advanced into the house, breaching walls and

---

[1]      The following factual background is presented for context only and to provide the Court with a depiction of the significant material that is publicly available about the raid.

doors with explosives.   Once inside the compound, the SEALs encountered the residents in the compound's guest house, in the main building on the first floor where two adult males lived, and on the second and third floors where bin Laden lived with his family.   According to reports, Abu Ahmed al-Kuwaiti, bin Laden's courier, opened fire on the first team of SEALs with an AK-47 from behind the guesthouse door, and a firefight took place between him and the SEALs in which al-Kuwaiti was killed.   Additionally, al-Kuwaiti's relative was shot and killed, before he could reach a weapon found lying nearby, by the SEALs' second team on the first floor of the main house.   Also, the SEALs were approached by one of bin Laden's adult sons who rushed towards the SEALs on the staircase of the main house and was shot and killed by the second team.

Once the SEALs cleared the first floor, the SEALs found bin Laden in his bedroom on the third floor.   Once inside, a member of the SEALs team shot bin Laden in the chest and then in the head. The SEAL subsequently radioed, "For God and country—Geronimo, Geronimo, Geronimo," and then, "Geronimo E.K.I.A.".   Still in the situation room, President Obama said, "We got him."   The SEALs collected information and took photographs, removed bin Laden's corpse, and left the compound.

The helicopters returned to Bagram Airfield and the body of bin Laden was then flown from Bagram to the aircraft carrier Carl Vinson in a V-22 Osprey escorted by two U.S. Navy F/A-18 fighter jets.   Once aboard the Carl Vinson, bin Laden's body was washed, wrapped in a white sheet, and placed in a weighted plastic bag. An officer read prepared religious remarks which were translated into Arabic by a native speaker. Afterward, bin Laden's body was placed onto a flat board. The board was tilted upward on one side and the body slid off into the sea.

**B.      Public Information on the Content of and the Decision to Release Post Mortem Photographs and Video Recordings of Osama bin Laden.**

Soon after the President announced the existence and success of the raid, it was reported that photographs and video recordings of bin Laden's body had been created.   Several news sources described the photographs as belonging to at least three different categories.   The categories included: (1) photographs taken within the compound in Pakistan; (2) photographs of bin Laden's body at a hangar after it was brought to Bagram Airbase in Afghanistan; and (3) photographs taken prior to and during the burial at sea on the U.S.S. Carl Vinson, which depicted bin Laden's body both before a shroud was placed on it and after it was wrapped in the shroud. *See e.g.,* Stacia Deshishku, *Even more details on the OBL photos*, CNN (May 3, 2011, 10:59 AM), attached as Exhibit A to the Declaration of Michael Bekesha ("Bekesha Decl.").

Following President Obama's announcement, the Department of Defense held a background briefing about the raid.   News Transcript, *DoD Background Briefing with Senior Defense Officials from the Pentagon and Senior Intelligence Officials by Telephone on U.S. Operations Involving Osama bin Laden*, U.S. Department of Defense (May 2, 2011), attached as Exhibit B to Bekesha Decl.   During the briefing, a reporter asked, "Do you plan to release any proof of death, such as images or video of the burial? And why haven't you done that yet?"   *Id.* To which, a senior intelligence official answered, "I think we need to take that question and get back to both."   *Id.*   Later that day at 2:00 p.m., Jay Carney, White House Press Secretary, and John Brennan, Assistant to the President for Homeland Security and Counterterrorism, held a press briefing.   News Transcript, *Press Briefing by Press Secretary Jay Carney and Assistant to the President for Homeland Security and Counterterrorism John Brennan, 5/2/2011*, The White House (May 2, 2011), attached as Exhibit C to Bekesha Decl.   When asked "where [are you] at

this point on the idea of releasing photos of bin Laden," Mr. Brennan responded, "We are less than 24 hours from the arrival on target of those individuals.   We have released a tremendous amount of information to date.   We are going to continue to look at the information that we have and make sure that we are able to share what we can, because we want to make sure that not only the American people but the world understand exactly what happened, and the confidence that we have that it was all conducted in accordance with the mission design." *Id*.   He further stated, "We are going to do everything we can to make sure that nobody has any basis to try to deny that we got Osama bin Laden.   And so, therefore, the releasing of information, and whether that includes photographs, this is something to be determined." *Id*.

Twenty-four hours later no decision had yet been made.   During his afternoon press briefing on May 3, 2011, Mr. Carney explained, "I don't have any updates on [the release of video or images], except to echo what John Brennan said this morning, which is that we're obviously reviewing information.   We've made a great deal available to the public in remarkable time; we're talking about the most highly classified operation that this government has undertaken in many, many years.   And the amount of information we've tried to provide you in this short period of time is quite substantial.   We will continue to review that and make decisions about the appropriateness of releasing more information as that review continues on."   News Transcript, *Press Briefing by Press Secretary Jay Carney, 5/3/2011*, The White House (May 3, 2011), attached as Exhibit D to Bekesha Decl.   Additionally, Mr. Carney had an exchange about some of the considerations being accounted for:

> Q:      And lastly, the previous administration did release photographs of
> high-value targets – Uday and Qusay Hussein as just two examples.   What would
> hold you back from doing this?   It seemed to have gone off relatively without a
> hitch, as far as I know.   Why would you not release a photograph of bin Laden?

> Mr. Carney:    Well, to be candid, there are sensitivities here in terms of the appropriateness of releasing photographs of Osama bin Laden in the aftermath of this firefight, and we're making an evaluation about the need to do that because of the sensitivities involved.   And we review this information and make this decision with the same calculation as we do so many things, which is what we're trying to accomplish and does it serve or in any way harm our interests.   And that is not just domestic, but globally.
>
> Q:    Can you explain sensitivities? Because it's a gruesome photograph, that that—
>
> Mr. Carney:    It's fair to say that it's a gruesome photograph.
>
> Q:    That it could be inflammatory?   That's the sensitivity you're –
>
> Mr. Carney:    It is certainly possible that – and this is an issue that we are taking into consideration, is that it could be inflammatory.

*Id*.   The same day, CIA Director Panetta was asked by Brian Williams of NBC Nightly News whether post mortem photographs of bin Laden would be released to the public.   News Transcript, *Leon Panetta talks about whether or not a photo of Osama bin Laden will be released to the public*, NBC Nightly News (May 3, 2011), attached as Exhibit E to Bekesha Decl.   Director Panetta responded, "I don't think there's – there was any question that ultimately a photograph would be presented to the public.   Obviously, I've seen those photographs, we've analyzed them, and there's no question that its bin Laden."   *Id*.   Director Panetta continued, "I think there's no question that there were concerns and there were questions that had to be debated about just exactly what kind of impact would these photos have.   But the bottom line is that, you know, we got bin Laden, and I think we have to reveal to the rest of the world the fact that we were able to get him and kill him."   *Id*.   Hence, as of May 3, 2011, no decision on whether to release the photographs had been made.   The CIA Director believed, however, that at least some photographs would ultimately be produced.

However, by the following afternoon, on May 4, 2011, a final decision was made.   Mr.

Carney began his 2:00 p.m. press briefing by stating, "[T]he President has made the decision not to

release any of the photographs of the deceased Osama bin Laden."   News Transcript, *Press

Briefing by Press Secretary Jay Carney, 5/4/2011*, The White House (May 4, 2011), attached as

Exhibit F to Bekesha Decl.   He then read the interview President Obama gave to CBS 60 Minutes.

*See* Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment

("Defs' Mem.") at 3.   Subsequently, Mr. Carney had the following exchanges with reporters:

> Q:     So was he, in the time period you're discussing, the moment he had the photos until now that we know the answer, was he grappling with this at all?   Or was his stance clear and he was just gathering other opinions?

> Mr. Carney:    Well, I don't know about the evolution of his decision-making process.   When I've heard him discuss it, he held this opinion very firmly.   And he has held that opinion very firmly.    But this is a very short period of time. Obviously he wanted to hear the opinions of others, but he was very clear about his view on this.   ***And obviously his decision is categorical***.

> Q:     One other question.   Director Panetta, in one of the interviews he did yesterday, said, "The government obviously has been talking about how best to do this, but I don't think there's -- there was any question that ultimately a photograph would be presented to the public."   How do you explain that?

> Mr. Carney:    What I would say is that there are compelling arguments for, in general, the release of information and there's a discussion to be had about the pros and cons.   ***And the President engaged in that discussion and made a decision***. Every member of the national security team is aware of and expressed the downside of releasing, which has I think weighed heavily on the President in terms of the potential risks it would pose to Americans serving abroad and Americans traveling abroad.

> -----

> Q:     Well, that I understand, but I'm saying his comment was there was no question that a photograph would be released -- obviously that was wrong.

8

Mr. Carney:    Well, look, *the thing is the President made this decision*.   He consulted members of his national security team.   There's reasonable arguments to be made.   The President felt very strongly and *made the decision he made*.

-----

Q:      I just want to clarify, you said that the President, based on your observations, had always held the position that these photos should not be released?

Mr. Carney:    Well, I don't know -- I just meant that we're now two and a half days since this took place, that I know he had this -- I heard him express this view yesterday.   *But there was still -- he was gathering the thoughts and views of others on his team*.   So "long held" is an impossible statement to make since we're only talking about a couple of days.

-----

Q:      And then, I know you answered this, but can you clarify -- you said no visual evidence at all is going to be released, including video or anything of that --

Mr. Carney:    That's right. . . . [The] visual record of Osama bin Laden's death or his deceased body.

*Press Briefing by Press Secretary Jay Carney, 5/4/2011*, attached as Exhibit F to Bekesha Decl.

(emphasis added).   Similarly, on the same day, Mark C. Toner, Acting Deputy Department

Spokesman for the Department of State informed reporters:

I'd refer you to the White House regarding the decision not to release a photo. And just on the Secretary's role, I would just say that she conveyed the State Department's views. This was an interagency discussion, and as Brennan – John Brennan and others have said, there was a very deliberate process on – towards making this decision, and she conveyed the State Department's views. But I don't want to get into the substance of those views.

News Transcript, *Daily Press Briefing by Acting Deputy Department Spokesman Mark C. Toner,*

*5/4/2011*, U.S. Department of State (May 4, 2011), attached as Exhibit G to Bekesha Decl.

Besides CIA Director Panetta and Secretary Clinton, Robert Gates, then-Secretary of the

Department of Defense, also weighed in on the decision to withhold all post mortem photographs

and video recordings of bin Laden.   Secretary Gates advocated for withholding the records because he feared that the photographs would be electronically altered.   Josh Gerstein, *Gates: Obama Kept bin Laden photo secret due to Photoshop fears*, Politico (May 12, 2011), attached as Exhibit H to Bekesha Decl.   Secretary Gates stated:

> One of the things that I think concerns Secretary Clinton and I is the risk not only of the pictures themselves inflaming people who were bin Laden's adherents and radical extremists, but we were also worried about the potential for manipulation of those photos and doing things with those photos that would be pretty outrageous in terms of provoking a reaction that might in fact put our troops at greater risk in both Iraq and Afghanistan.

*Id.*   Once the decision was made, it was final.   The government decided not to release any post mortem photographs or video recordings of bin Laden.

However, members of Congress were unsatisfied with the President's decision.   The CIA therefore allowed members of the Armed Service and Intelligence Committees in Congress to view some of the photographs at the CIA headquarters.   After viewing the photographs, Senator Jim Inhofe was interviewed by Elliott Spitzer of CNN.   Senator Inhofe, a member of the Senate Armed Services Committee, described what he saw:

> There are 15 pictures. The first 12 were taken in the compound -- it's obvious it's right after the incident took place. So they're pretty grueling. The other three were taken on the ship. And they included the burial at sea.

> So I would say this. Three of the first 12 pictures were of Osama when he was alive. And they did this for the purpose of being able to look at those and seeing the nose, the eyes and his relationship for positive identification purposes. And that was good.

> One of the things that was -- you know I had to make my own conclusion on this because they're not really sure. One of the shots went through an ear and out through the eye socket, or it went in through the eye socket and out -- and then exploded. It was that kind of ordinance that it was.

Now that caused the brains to be hanging out of the eye socket, so that was pretty gruesome.

But the revealing shots really, I thought, the pictures, were the three that were taken on the USS Vinson in the Northern Arabian Sea, and they were the ones that showed him during the cleanup period. In the cleanup period, he had some kind of undergarment, very, very pale.

But they had taken enough blood and material off his face so it was easier to identify who it was. Now those are the ones -- and then of course the burial at sea, had the transition -- first of all, identifying who it was. Then of course the fact that they buried him at sea.

News Transcript, *Bin Laden's Diaries of Planned Attacks; Senator Views Pictures of bin Laden's Body; China Interested in Stealth Technology*, CNN: In the Arena (May 11, 2011), attached as Exhibit I to Bekesha Decl.   In addition, Senator Inhofe stated, "I still believe they should release these pictures – some of the pictures, to the public.   At least the ones during the cleanup period on the USS Vinson.   That's just a personal opinion."   *Id*.   Also, Senator Inhofe discussed whether the photographs should be withheld to prevent inflaming overseas populations:

And I don't buy this whole concept that's coming out of the White House that, you know, you don't want to do this, you might make the terrorists mad. Well, you know, those people want to kill all of us anyway. They've tried 32 times, maybe more than that, during the -- since 9/11 on very sophisticated plans to do some -- inflict a lot of harm to America.   We've stopped each one of them. So if they have a way of doing it, they're going to do it anyway. It's not going to be because they have seen some gruesome picture –

*Id*.   Besides members of Congress, many others wanted to visually capture this historical event. At least six entities, including Plaintiff, filed a FOIA request for the records.   John Hudson, *A Look at Who's FOIAing the Bin Laden Death Photo*, Atlantic Wire (May 9, 2011), attached as Exhibit J to Bekesha Decl.

### C.   Executive Order 13526 Establishes a Uniform System for Classifying National Security Information.

President Obama issued Executive Order 13526 on December 29, 2009.   It is entitled "Classified National Security Information" and "prescribes a uniform system for classifying, safeguarding, and declassifying national security information" while recognizing that "democratic principles require that the American people be informed of the activities of their Government." Exec. Order No. 13526, 3 C.F.R. 707 (2010) ("EO 13526").   The Executive Order is divided into six parts; however, Part 1 – Original Classification is the only one of relevance to the instant case. First, the Executive Order establishes the conditions in which material may be originally classified.   The conditions are:

(1) an original classification authority is classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

EO 13526, § 1.1.   Second, EO 13526 creates three levels of classification.   At issue in the instant case is the "Top Secret" level which can only be applied to material that "reasonably could be expected to cause exceptionally grave damage to the national security."   EO 135256, § 1.2. Third, the Executive Order identifies who has the authority to classify material.   EO 135256, §

1.3.   Fourth, EO 13526 identifies the eight classification categories of which material must pertain to one or more of to be classified. The classification categories, at issue in the instant case, are:

> (a)  military plans, weapons systems, or operations;
>
> (c)  intelligence activities (including covert action), intelligence sources or methods, or cryptology;
>
> (d)  foreign relations or foreign activities of the United States, including confidential sources;

EO 135256, § 1.4.

Fifth, EO 13526 requires that at the time of classification, the individual classifying the material must establish a specific date or event for declassification.   EO 135256, § 1.5.   Sixth, the Executive Order instructs that the individual classifying the material indicate in a manner that is immediately apparent:

> (1)  one of the three classification levels defined in section 1.2 of this order;
>
> (2)  the identity, by name and position, or by personal identifier, of the original classification authority;
>
> (3)  the agency and office of origin, if not otherwise evident;
>
> (4)  declassification instructions
>
> (5)  a concise reason for classification that, at a minimum, cites the applicable classification categories in section 1.4 of this order.

EO 135256, § 1.6.   Seventh, EO 13526 prohibits the classification of material in order to:

> (1)  conceal violations of law, inefficiency, or administrative error;

13

(2) prevent embarrassment to a person, organization, or agency;

(3) restrain competition; or

(4) prevent or delay the release of information that does not require protection in the interest of

the national security.

EO 135256, § 1.7.   In addition, § 1.7 imposes additional requirements for classification on

information not previously classified and subject to a FOIA request.

## III.    SUMMARY OF THE ARGUMENT.

To properly withhold material under FOIA, Defendants must satisfy certain, general

burdens under the statute as well as meet specific burdens associated with their claims of

exemption.   Defendants have failed to do so.

First, Defendants fail to satisfy basic, general requirements of FOIA.   Specifically,

Defendants do not demonstrate that they have conducted an adequate search for records responsive

to Plaintiff's FOIA request.   In addition, Defendants do not identify the specific type of media

each record is.   Also, Defendants do not adequately describe each withheld record.   Finally,

Defendants do not correlate specific claims of exemption to particular records.

Second, Defendants fail to satisfy specific burdens associated with claims of Exemptions 1

and 3.   With respect to Exemption 1, Defendants do not demonstrate that they complied with the

proper classification procedures.   In addition, Defendants do not demonstrate that each withheld

record pertains to one or more classification category.   Also, Defendants do not demonstrate, as

they must, that the release of each withheld record would cause exceptionally grave damage to the

national security.   Finally, with respect to Exemption 3, Defendants do not demonstrate that each

withheld record pertains to intelligence activities and methods.

14

Because Defendants fail to satisfy their general and specific burdens, Defendants' motion for summary judgment should be denied, and Plaintiff's cross-motion for summary judgment should be granted.

## IV. ARGUMENT.

### A. Defendants' Search for and Decision to Withhold All 52 Records Are Reviewed *De Novo*.

In FOIA litigation, as in all litigation, summary judgment is appropriate only when the pleadings and declarations demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed.R.Civ.P. 56(c).   In FOIA cases, decisions by a government agency to "withhold or disclose information under FOIA are reviewed *de novo*."   *Judicial Watch, Inc. v. U.S. Postal Service*, 297 F. Supp. 2d 252, 256 (D.D.C. 2004).   In reviewing a motion for summary judgment under FOIA, the court must view the facts in the light most favorable to the requester. *Weisberg v. U.S. Department of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).

### B. Defendants Fail to Demonstrate that They Conducted an Adequate Search for Responsive Records.

For a government agency to obtain summary judgment on the adequacy of the search, "the agency must demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"   *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 890 (D.C. Cir. 1995) (*quoting Truitt v. U.S. Department of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). Specifically, an agency "must make a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested, and it **cannot limit its search to only one record system if there are others that are likely to turn**

*up the information* requested." *Nation Magazine*, 71 F.3d at 890 (internal citations omitted) (emphasis added).

Defendants contend that DoD conducted a reasonable search and that it did not locate any records responsive to Plaintiff's FOIA request. Defs' Mem. at 9. In support of their argument, Defendants submitted the Declaration of William T. Kammer, Chief of the Freedom of Information Division, Executive Services Directorate, Washington Headquarters Service. Mr. Kammer testifies that he oversees the processing of initial FOIA requests for documents within the possession and control of the Office of the Secretary of Defense ("OSD") and the Office of the Chairman of the Joint Chiefs of Staff ("OCJCS"). Declaration of William T. Kammer ("Kammer Decl.") at ¶ 1. In addition, he oversees the processing of FOIA Appeals for the OSD, OCJCS, and the U.S. Special Operations Command ("USSOCOM"). *Id.*

With respect to Plaintiff's FOIA request, Mr. Kammer testifies that DoD determined that only OCJCS, USSOCOM, and the Department of the Navy were the likely components to have responsive records. *Id.* at ¶ 4. Therefore, DoD searched for all hard copy and electronic records within these entities. *See id.* at ¶¶ 5, 7, and 8. Significantly, however, according to Mr. Kammer's declaration, DoD did not search at least one critical location – the Office of the Secretary. By itself, this demonstrates that DoD conducted an unreasonably narrow search. As referenced above, it has been widely reported that Secretary Gates advised President Obama about whether to release post mortem photographs of bin Laden. To be able to provide such advice, it is nearly inconceivable that DoD did not have possession of the photographs. At a minimum, a search should have been conducted of the OSD.

16

In addition, Mr. Kammer does not testify as to whether any records exist depicting the period after the SEALs left Pakistan with bin Laden's body.   As stated above, the SEALs returned to Bagram Airfield in Afghanistan before military personnel transported bin Laden's body to the U.S.S. Carl Vinson in a V-22 Osprey escorted by two U.S. Navy F/A-18 fighter jets.   Presumably, DoD personnel were in charge at the U.S. Army military base, during the transport on military aircraft, and finally upon a military aircraft carrier.   If photographs and video recordings were created subsequent to the completion of the intelligence mission within Pakistan[2] – as reported by numerous media organizations – it is highly likely that such records would be in the possession of DoD.

Also, based on Mr. Kammer's declaration, it is not apparent that Defendants conducted a search of the Joint Worldwide Intelligence Communications System ("JWICS").   JWICS is a system of interconnected computer networks used by DoD and the U.S. Department of State to transmit classified information by packet switching over TCP/IP in a secure environment. Because it has also been reported that Secretary of State Hillary Clinton provided advice to President Obama about whether to release post mortem photographs of bin Laden, it is more than plausible that responsive records were transmitted to/from DoD or the U.S. Department of State via JWICS.

In light of these three critical omissions by Mr. Kammer, it is clear that DoD should have conducted a broader search.   *Nation Magazine*, 71 F.3d at 890 (internal citations omitted). Therefore, because DoD did not conduct "a search reasonably calculated to uncover all relevant

---

[2]     As noted above, CNN reported that one category of records received by the White House were photographs of bin Laden's body taken at a hangar after it was brought to Bagram Airbase in Afghanistan.

documents[,]" DoD must be compelled to conduct a proper search of all record systems, including

that of the Office of the Secretary, for records responsive to Plaintiff's request, and Plaintiff is

entitled to summary judgment regarding the inadequacy of DoD's original search. *Steinberg v.*

*U.S. Department of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994), *quoting Weisberg*, 745 F.2d at

1485.

### C. Defendants' *Vaughn* Declarations Are Inadequate.

"The typical FOIA case 'distorts the traditional adversary nature of our legal system's form

of dispute resolution.'" *Judicial Watch, Inc. v. Food and Drug Administration*, 449 F.3d 141, 145

(D.C. Cir. 2006) (citations omitted). "When a party submits a FOIA request, it faces an

'asymmetrical distribution of knowledge' where the agency alone possesses, reviews, discloses,

and withholds the subject matter of the request." *Id.* Because of this lopsided relationship, the

burden is on the agency to establish its right to withhold information from the public. *Coastal*

*States Gas Corporation. v. U.S. Department of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980).

An agency withholding records must supply "a relatively detailed justification, specifically

identifying the reasons why a particular exemption is relevant and ***correlating those claims with***

***the particular part of a withheld document to which they apply***." *Mead Data Central, Inc. v.*

*U.S. Department of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977) (emphasis added). In

*Dellums v. Powell*, 642 F.2d 1352, 1361 (D.C. Cir. 1980), the D.C. Circuit held that the

government agency was required to "demonstrat[e] the applicability of the exemptions invoked *as*

*to each document or segment withheld*." *King v. U.S. Department of Justice*, 830 F.2d 210, 224

(D.C. Cir. 1987) (*citing Dellums,* 642 F.2d at 1361) (emphasis in original). Additionally, the

government agency's submissions must "'adequately describe[] each withheld record or deletion

and set[] forth the exemption claimed and why that exemption is relevant.'"   *King*, 830 F.2d at

224 (*quoting Paisley v. Central Intelligence Agency*, 712 F.2d 686, 690 (D.C. Cir. 1983)).   Such

specificity is necessary so that a FOIA requester is "able to contest the [government agency's]

basis for the redactions."   *Campbell v. U.S. Department of Justice*, 231 F. Supp. 2d 1, 11 (D.D.C.

2002).

The chief declaration submitted by Defendants to support their motion for summary

judgment fails to satisfy this well-established standard.   *See generally* Declaration of John

Bennett, Director of the National Clandestine Service of the CIA ("Bennett Decl.").   First,

Defendants fail to identify the specific type of media each record is.   Plaintiff requested all

photographs and video recordings taken of bin Laden following the raid.   In his declaration,

Director Bennett asserts that as a result of the CIA's search, 52 unique records responsive to

Plaintiff's request were located.   *Id.* at ¶ 11.   In addition, he states that the "records are

***photographs and/or video recordings*** taken of [bin Laden] on or about 1 May, 2011."   *Id.*

(emphasis added).   Based on his statement, Defendants have not demonstrated whether all 52

records are photographs, video recordings, or some sort of hybrid of the two types of media.   It is

Defendants' burden to demonstrate whether the responsive records are photographs or video

recordings, and therefore, Defendants should be ordered to provide such evidence.[3]

Second, Defendants fail to adequately describe each withheld record.   Nor do Defendants

adequately describe categories of records, specify which particular records fall into each category,

---

[3]   Plaintiff reserves the right to challenge the reasonableness of Defendants' search based on
any such supplemental evidence.   If all 52 unique records are photographs, Defendants must
demonstrate that they searched for video recordings.   Based on their current submissions, it is
unclear whether such a search was performed.

or state whether any of the records fall into more than one category.   Rather, Defendants describe

the records as consisting of the following five categories of records generally:   (1) images taken

inside the compound in Abbottabad, Pakistan, where bin Laden was killed; (2) images taken as bin

Laden's body was transported from the Abbottabad compound to the location where he was buried

at sea; (3) images depicting the preparation of bin Laden's body for the burial; (4) images of the

burial itself; and (5) images taken for purposes of conducting facial recognition analysis of the

body in order to confirm that it was bin Laden.   Defs' Mem. at 4-5.   It is unclear, however,

whether these categories accurately describe the records.   As noted above, Senator Inhofe viewed

15 photographs depicting bin Laden's body after the raid.   He stated that the photographs he

viewed fell into only two categories: (1) photographs taken in the compound in Pakistan and (2)

photographs taken aboard the U.S.S. Carl Vinson, which included the "cleanup period" and the

burial at sea.   In addition, there were numerous news reports that the President received three

categories of photographs.   The three categories included: (1) photographs taken within the

compound in Pakistan; (2) photographs of bin Laden's body at a hangar after it was brought to

Bagram Airbase in Afghanistan; and (3) photographs taken prior to and during the burial at sea on

the U.S.S. Carl Vinson, which depicted bin Laden's body both before a shroud was placed on it

and after it was wrapped in the shroud.   Defendants fail to even address whether photographs

were taken at Bagram Airbase or whether they are included in the 52 records.

In some instances, categorization may be appropriate – Plaintiff does not concede that this

is such an instance[4] – however "[t]he availability of categorization does not ... supplant the

_____

[4]       Courts have recognized that "a system for categorizing Exemption 1 claims may be
appropriate, particularly where the documents in question are voluminous and the same exemption
applies to a large number of segments."  *King*, 830 F.2d at 224.   Defendants have not

demand for particularity." *King*, 830 F.2d at 224.   In the instant case, Defendants fail to satisfy

this basic requirement of FOIA.   Defendants have not demonstrated how many records fall into

each category or whether these categories are even accurate and comprehensive.   Based on public

statements by a U.S. Senator as well as a senior government official, it is, at a minimum, unclear

whether Defendants' descriptions are accurate and complete.   It is Defendants' burden to

adequately describe the 52 records or categories of records, and therefore, Defendants should be

ordered to provide such evidence.

   Third, Defendants fail to adequately describe "each withholding" and "the consequences of

disclosing the sought-after information."   *Id*. at 223-224.   As Plaintiff will demonstrate below,

Defendants fail to correlate specific claims of exemption with particular records.   Defendants

have not demonstrated that all 52 records are being properly withheld under Exemptions 1 and 3.

It is Defendants' burden to correlate specific claims of exemption to particular records or

categories of records, and therefore, Defendants should be ordered to provide such evidence.

   In sum, Defendants clearly fail to meet some of the most basic and general requirements of

FOIA.   Defendants have not demonstrated that they conducted a search reasonably calculated to

uncover all responsive records.   Nor have they provided sufficient evidence concerning the types

of records that they continue to withhold and any specific reason for withholding them.   In

addition, they fail to correlate specific claims of exemption with particular records.   Defendants'

motion for summary judgment therefore must be denied, and they should be ordered to provide

sufficient evidence that they have satisfied their burdens under FOIA or, if they cannot provide

---

demonstrated that 52 unique records are unduly voluminous or that the reasons for withholding the
records are the same for a large number of the records.

such evidence, be ordered to search for and produce all non-exempt records responsive to

Plaintiff's FOIA request.

> **D.    Defendants Fail to Demonstrate that All 52 Records Are Being Properly Withheld under Exemption 1.**

Defendants claim to be withholding all 52 responsive records pursuant to Exemption 1.

Defs' Mem. at 10-17.   Exemption 1 protects from disclosure material that is "specifically

authorized under criteria established by an Executive order to be kept secret in the interest of

national defense or foreign policy and [is] in fact properly classified pursuant to Executive order."

5 U.S.C. § 552(b)(1).   In other words, a government agency may only invoke Exemption 1 if "it

complies with [the] classification procedures established by the relevant executive order and

withholds only such material as conforms to the order's substantive criteria for classification."

*King*, 830 F.2d at 214.

Additionally, courts have recognized that "even when applying exemption 1, 'conclusory

affidavits that merely recite statutory standard, or are overly vague or sweeping will not, standing

alone, carry the government's burden.'"   *International Counsel Bureau v. U.S. Department of

Defense*, 723 F. Supp. 2d 54, 63 (D.D.C. 2010) (*quoting Larson v. U.S. Department of State*, 565

F.3d 857, 864 (D.C. Cir. 2009).   Similarly, the "D.C. Circuit has made clear that 'a categorical

description of redacted material coupled with a categorical indication of anticipated consequences

of disclosure' is 'clearly inadequate' to support withholding records, even under exemption 1."

*International Counsel Bureau*, 723 F. Supp. 2d at 64 (*quoting Campbell v. U.S. Department of

Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998)).   In other words, even in the national security context,

the government must provide "a relatively detailed justification" as to why a particular record is

being withheld.   *Mead Data Central, Inc.*, 566 F.2d at 251.

       1.       **Defendants fail to demonstrate that they have complied with the classification procedures of EO 13526.**

"To be classified properly, a document must be classified in accordance with the procedural criteria of the governing Executive Order as well as its substantive terms." *Lesar v. U.S. Department of Justice*, 636 F.2d 472, 483 (D.C. Cir. 1980); *see also Schoenman v. Federal Bureau of Investigation*, 575 F. Supp. 2d 136, 152 (D.D.C. 2008) (Whether a government agency has "compli[ed] with the procedural requirements of [the governing Executive Order] is of great importance."); *Washington Post v. U.S. Department of Defense*, 766 F. Supp. 1, 7 (D.D.C. 1991) ("In the first place, in addition to showing that the agency's classification decisions meet the substantive criteria of [the governing Executive Order], [a government agency] must also demonstrate that its determinations have satisfied the order's procedural criteria."). Defendants rely on Director Bennett's declaration to support their claim that Defendants have satisfied EO 13526's procedural criteria. However, Director Bennett's declaration does little more than present self-serving, conclusory statements such as "I have determined that the responsive records at issue in this case are currently and properly classified in accordance with the substantive and procedural requirements of EO 13526." Bennett Decl. at ¶ 13. Director Bennett's declaration simply fails to demonstrate that Defendants complied with the specific classification procedures of EO 13526.

First, Defendants fail to identify who classified the records. Director Bennett testifies as to who generally has the authority to classify information as TOP SCERET and who generally has the authority to delegate such authority. Bennett Decl. at ¶¶ 14-15. In addition, Director Bennett states that the "Director of the CIA has delegated original TOP SECRET classification authority to me. As an original classification authority, I am authorized to conduct classification reviews and

to make original classification decisions." *Id*. at ¶ 18.   Yet, Director Bennett does not testify that

he personally classified the records.   Nor does he state that any other authorized official actually

classified the records.   As Director Bennett testifies, only the President, the Vice President,

agency heads, and individuals who had the authority delegated to them by the President, the Vice

President, or agency heads have the authority to classify information as TOP SECRET.   *Id*. at ¶

14.   Because the universe of individuals who have original TOP SECRET classification authority

is minimal, Defendants must demonstrate that the individual who classified the 52 records as TOP

SECRET had the authority to do so.   It is Defendants' burden to demonstrate who classified the

records and whether that individual had the proper authority to do so, and Defendants should be

ordered to provide such evidence.   If an individual without the proper authority classified the

records, Defendants have not complied with the procedural requirements of EO 13526.

Second, Director Bennett does not specifically testify as to when the 52 records were

classified.   Director Bennett only states that as of September 26, 2011, the 52 records are

currently and properly classified.   Yet, the day Director Bennett drafted and signed his declaration

is inconsequential.   The operative date as to whether the classification occurred according to

proper procedures is the date of classification.   As stated above, different procedures exist for

records that were classified prior to or subsequent to the receipt of a FOIA request.   Once a FOIA

request has been received, a government agency can only classify material "if such classification

meets the requirements of this order and is accomplished ***on a document-by-document basis with***

***the personal participation or under the direction of the agency head, the deputy agency head, or***

***the senior agency official designated under section 5.4 of this order.***"   EO 13526, § 1.7(d)

(emphasis added).   The raid and the creation of the records occurred on May 1, 2011.   Bennett

Decl. at 4, n. 2.   Plaintiff and others submitted FOIA requests for the records as early as May 2,

2011.[5]   As stated above, President Obama explained around 1:00 p.m. on May 4, 2011 that he had

made the decision to not release post mortem photographs of bin Laden.   In addition,

then-Director Panetta stated on the evening of May 3, 2011 that at least some of the photographs

would be released.   In other words, as of the morning of May 4, 2011, no decision had been

reached.   Since Plaintiff sent its FOIA request on May 2, 201, it is more than likely that the

records were classified *after* a FOIA request for the records was received.   Yet, Defendants have

not presented any evidence as to whether the 52 records were classified between their creation and

the President's comments, or after the President's comments and prior to September 26, 2011.   In

addition, if the records were classified after a FOIA request was received, Defendants have failed

to demonstrate that the 52 records were classified *on a document-by-document basis*.   Also, as

stated above, Defendants have not presented any evidence of who classified the records.

Therefore, Defendants have also failed to demonstrate whether the records were classified *with the*

*personal participation or under the direction of the agency head, the deputy agency head, or the*

*senior agency official designated under section 5.4 of this order.*   It is Defendants' burden to

demonstrate specifically when the records were classified, and Defendants should be ordered to

provide such evidence.   If the records were classified on the morning of May 4, 2011 and the

records were not classified on a document-by-document basis by an individual with proper

authority, Defendants have not complied with the procedural requirements of EO 13526.

   Third, Defendants fail to demonstrate the date or event on which the 52 records will be

declassified.   Pursuant to Section 1.5, "At the time of original classification, the original

---

[5]     Mr. Kammer testifies that the FOIA request dated May 2, 2011 was received on May 3,
2011.   Kammer Decl. at ¶ 3.

classification authority shall establish a specific date or event for declassification based on the duration of the national security sensitivity of the information."   EO 13526, § 1.5(a).   Director Bennett in no way references this requirement.   *See* Bennett Decl. ¶¶ 13-22.   It is Defendants' burden to demonstrate that a declassification date was established, and Defendants should be ordered to provide such evidence.   If a declassification date was not established, Defendants have not complied with the procedural requirements of EO 13526

Fourth, Defendants fail to demonstrate that the records were properly identified and marked.   As stated above, "at the time of original classification," an agency must "indicate[] in a manner that is immediately apparent" very specific information.   EO 13526, § 1.6.   Director Bennett does not testify that any of the 52 records have been properly marked or that the required information is immediately apparent.   It is Defendants' burden to demonstrate whether the records were properly identified and marked, and Defendants should be ordered to provide such evidence.   If the records were not properly identified and marked, Defendants have not complied with the procedural requirements of EO 13526.

The declarations submitted by Defendants are similar to the inadequate declarations submitted to and rejected in *Allen v. Central Intelligence Agency*, 636 F.2d 1287 (D.C. Cir. 1980).   In *Allen*, the CIA presented affidavits that were "drawn in conclusory terms that merely parrot the language of the Executive Order."   636 F.2d at 1292.   In that case, the D.C. Circuit found that because of the inadequacy of the affidavits, there was no basis "on which a trial court might conclude that the procedural requirements of [the governing Executive Order] have been satisfied."   *Id*.   In addition, the Court noted that the "two affidavits . . . indicate neither the 'identity of the original classifier' nor 'the date or event for declassification or review.'"   *Id*.   The

Court therefore remanded the case to the district court for additional proceedings.   *Id*. at 1300.   In contrast, based on submitted declarations, Judge Henry H. Kennedy in *Council for a Livable World v. U.S. Department of State*, 96-CV-1807, 1998 U.S. Dist. LEXIS 23643 (D.D.C. Nov. 23, 1998) found that because the U.S. Department of State "did not classify the documents . . . in accordance with proper procedure, the documents must be disclosed."   Because Defendants have failed to demonstrate that they have complied with the classification procedures of EO 13526, at a minimum, Defendants should be ordered to provide evidence of their compliance.   If Defendants cannot demonstrate that they have complied with the classification procedures of EO 13526, Defendants must produce all 52 records to Plaintiff.

2.    **Defendants fail to demonstrate that all 52 records conform to EO 13526's substantive criteria for classification.**

Along with demonstrating that it complied with the classification procedures of EO 13526, a government agency must also demonstrate that the withheld material conforms to the order's "substantive criteria for classification."   *King*, 830 F.2d at 214.   To conform to EO 13526's substantive criteria for classification, the agency must demonstrate that withheld records pertain to one of the classification categories contained in Section 1.4 *and* that public disclosure of the withheld information reasonably could be expected to result in damage to the national security. EO 13526, § 1.1(4); *see also ACLU v. U.S. Department of Defense*, 628 F.3d 612, 623-624 (D.C. Cir. 2011); *Larson*, 565 F.3d at 863-864.

Although substantial weight is given to a government agency's declaration in the context of national security, "deference is not equivalent to acquiescence; the declaration may justify summary judgment only if it is sufficient 'to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the

withholding.'"   *Campbell,* 164 F.3d at 30; *see also International Counsel Bureau*, 723 F. Supp.

2d at 63.   In addition, a declaration may be insufficient due to "lack of detail and specificity."

*Campbell*, 164 F.3d at 30.   In other words, despite the deference given to the government, a

"declaration must meet certain standards in order to justify a grant of summary judgment."   *Id*.

Defendants fail to provide sufficient detail and specificity with respect to which records pertain to

which, if any, classification categories and whether the release of each and every record

reasonably could be expected to result in exceptionally grave damage to the national security.

> **a.   Defendants fail to demonstrate that all 52 records pertain to one or more of the classification categories of EO 13526, § 1.4.**

As stated above, EO 13526, § 1.4 requires that classified material pertain to one or more

specified categories.   Director Bennett testifies that all 52 records pertain to:

> (a)   Military plans, weapons systems, or operations;
>
> (c)   Intelligence activities (including covert action), intelligence sources or methods, or cryptology; and
>
> (d)   Foreign relations or foreign activities of the United States, including confidential sources.

Bennett Decl. at ¶ 21.   Defendants however fail to satisfy their burden of demonstrating that each

and every record pertains to one or more of these three categories.

Defendants assert that they have submitted three affidavits to support their claim that all 52

records pertain to (a) military plans, weapons systems, or operations; (c) intelligence activities

(including covert action), intelligence sources or methods, or cryptology; and (d) foreign relations

or foreign activities of the United States, including confidential sources.   Defs' Mem. at 11.

However, upon close examination, Defendants submit ***only one declaration*** that purportedly

demonstrates that all records pertain to military plans, weapons systems, or operations; ***only one declaration*** that purportedly demonstrates that some records pertain to intelligence activities (including covert action), intelligence sources or methods, or cryptology; ***and no declaration*** that demonstrates that any records pertain to foreign relations or foreign activities of the United States, including confidential sources.   In addition, the evidence submitted by Defendants is no more than conclusory declarations with overly vague and sweeping statements.

In his declaration, Director Bennett testifies that "the release of ***certain responsive records*** could reveal intelligence activities and methods that were employed during or after the operation." Bennett Decl. at ¶ 28 (emphasis added).   In other words, Director Bennett only testifies that ***some of the records*** pertain to intelligence activities, intelligence sources or methods.   He does not describe which records they are.   Nor does he describe how many there are.   In addition, he relies on overly vague and sweeping statements to justify his assertion.   *International Counsel Bureau*, 723 F. Supp. 2d at 63.   He simply states that "the release of certain responsive records would reveal information about intelligence methods or activities by providing insight into the manner in which the photographs or video recordings were obtained as well as the purpose, utility, or manner in which the photographs or video recordings could be used by the CIA and the extent or limitations of such capabilities." *Id*. at 29.   Director Bennett then testifies that "[b]y way of example, release of post-mortem photographs of [bin laden] that were used to conduct facial recognition analysis could provide insight into the manner in which such analysis is conducted or the extent or limitation of such analysis." *Id*.   Although Plaintiff does not concede that such

records would reveal any information not already publicly available,[6] Plaintiff recognizes that

such records might be properly withheld to prevent the disclosure of classified intelligence

methods, and if Defendants can sufficiently identify such records and provide evidence that they

have been properly classified, Plaintiff does not seek their release.   However, as Plaintiff

demonstrated earlier, there are at least five unique categories of records being withheld by

Defendants.   Only some of the 52 records were used to conduct facial recognition analysis.   The

other categories include photographs that were taken: (1) inside the compound in Abbottabad,

Pakistan, where bin Laden was killed; (2) when bin Laden's body was transported from the

Abbottabad compound to the location where he was buried at sea; (3) depicting the preparation of

bin Laden's body for the burial; and (4) during the burial itself.   In addition, Senator Inhofe

described viewing specific photographs taken aboard the U.S.S. Carl Vinson, which included the

"cleanup period" and the burial at sea.   Also, a senior government official described some of the

records as depicting bin Laden's body at a hangar after it was brought to Bagram Airbase in

Afghanistan and depicting bin Laden's body wrapped in a shroud in preparation for the burial at

sea.   In other words, Director Bennett describes a specific subset of the records that must be

withheld; he does not offer a full accounting of each and every record being withheld.   Director

---

[6]      When considering Defendants' claim of the sensitive equipment used to identify bin
Laden, it should be noted that reports have indicated that the SEALs used equipment exactly the
same or similar to facial recognition devices known as "SEEK II" and/or "HIIDE 5."   Marcus
Weisgerber, *Stealth Helo, Other High-Tech Gear Used in Raid*, Defense News at 6 (May 9, 2011);
*CSI Bin Laden: Commandos Use Thumb, Eye Scans to Track Terrorists*, Gizmodo (May 3, 2011),
attached as Exhibit K to the Bekesha Decl.   These devices are the most widely-deployed,
handheld multi biometric devices.   Their technical specifications and even a user manual are
easily accessible on the Internet.   Exhibit L to the Bekesha Decl.   In addition, DoD's own
website provides the public with the opportunity of purchasing photographs and video recordings
of military personnel using this equipment and discussing its capabilities.   Exhibit M to Bekesha
Decl.

Bennett simply fails to demonstrate how these **other records** would reveal classified intelligence methods.

Similarly, Director Bennett testifies that the "[r]elease of **other images** could similarly reveal the types of equipment or other tools that were utilized (or not) during the execution of a highly sensitive intelligence operation." *Id.* (emphasis added).   Again, this statement is not specific and is overly broad and sweeping. *International Counsel Bureau*, 723 F. Supp. 2d at 63. Plaintiff has only sought photographs and video recordings of bin Laden.   Plaintiff does not seek all photographs and video recordings taken during or after the raid.[7]   Therefore, it is not plausible that each and every one of the 52 records contain visuals of equipment and other tools.[8]   Because Director Bennett uses the inherently imprecise phrase "certain responsive records" and "other images" to describe the records being withheld because they could reveal equipment or other tools, he fails to provide sufficient evidence to satisfy Defendants' burden. *Campbell*, 164 F.3d at 30.

To support their claim that each and every record pertain to military plans, weapons systems, or operations, Defendants submit the Declaration of William H. McRaven, Commander of the United States Special Operations Command.   Admiral McRaven testifies that his declaration supplements the declaration of Director Bennett "to explain further how the responsive

---

[7]      To the extent that the records contain visuals of equipment and other tools, Defendants have failed to demonstrate that those portions of those records cannot be segregated from the visual of bin Laden's body. *Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (A government agency "must demonstrate that, even where particular exemptions properly apply, all non-exempt material has been segregated and disclosed."); *see also Summers v. U.S. Department of Justice*, 140 F.3d 1077, 1081 (D.C. Cir. 1998) ("A segregability determination is absolutely essential to any FOIA decision.").   Mr. Bennett does no more than provide a conclusory statement that segregability cannot be done.   Bennett Decl. at ¶ 36.   Therefore, at a minimum, Defendants should be ordered to demonstrate why they cannot "black out" the visuals of the equipment or other tools and leave the visual of bin Laden's body.

[8]      *See* footnote 6 above.

records contain sensitive information that pertains to "military plans, weapons systems, or

operations under Section 1.4(a)."   Declaration of William H. McRaven ("McRaven Decl.") at ¶ 2.

Under seal, Admiral McRaven purportedly testifies that the release of all 52 records would "make

the special unit that participated in this operation and its members more readily identifiable in the

future, reveal classified Sensitive Site Exploitation Tactics, Techniques, and Procedures and other

classified information specific to special operations, and reveal the methods that special operations

forces use for identification of captured and killed personnel."   *Id*. at ¶ 3.   This assertion is

largely beside the point as Plaintiff only seeks photographs and video recordings of bin Laden, not

records of the tactics, techniques, procedures, or personnel.[9]   In addition, Admiral McRaven does

not address the five categories of records and how each one would pertain to military plans,

weapons, or operations.[10]   Even if some deference is given to the redacted testimony of Admiral

McRaven, Defendants will have, at most, only satisfied their burden with respect to those records

that actually pertain to military plans, weapons systems, or operations.

However, to date, Defendants have failed to demonstrate that the photographs that were

taken as bin Laden's body was being transported from the compound in Pakistan to the location

where he was buried at sea, including any taken at Bagram Airbase, as well as the photographs that

---

[9]      Also, Admiral McRaven fails to address whether any portions of the records can be
segregated.  *Sussman*, 494 F.3d at 1116.   Therefore, Defendants fail to provide any evidence that
visuals of tactics, techniques, procedures, or personnel cannot be segregated from the visual of bin
Laden's body.   At a minimum, Defendants should be ordered to demonstrate why they cannot
"black out" the visuals of highly sensitive material.

[10]      Besides those photographs taken for facial recognition purposes, the other categories are
photographs that were taken inside the compound in Abbottabad, Pakistan, where bin Laden was
killed; were taken as bin Laden's body was transported from the Abbottabad compound to the
location where he was buried at sea; depict the preparation of bin Laden's body for the burial; and
are of the burial itself.

depit the preparation of bin Laden's body for the burial and the burial itself pertain military plans,

weapons systems, or operations.   In addition, Admiral McRaven also does not testify that any of

the 52 records pertain to intelligence activities (including covert action), intelligence sources or

methods, or cryptology and foreign relations or foreign activities of the United States, including

confidential sources.   Because Admiral McRaven fails to provide sufficient evidence as to which

records are being withheld because they pertain military plans, weapons systems, or operations,

Defendants fail to satisfy their burden of demonstrating that each and every record must be

withheld.   *Campbell*, 164 F.3d at 30.

Finally, Defendants assert that the Declaration of Robert B. Neller provides evidence that

the responsive records pertain to military plans, weapons systems, or operations.   However, the

declaration does no such thing.   The declaration only addresses whether General Neller believes

that the release of the responsive records reasonably could be expected to harm the national

security.   *See generally* Neller Declaration.   Similarly, the declaration does not present any

evidence that the 52 records pertain to intelligence activities (including covert action), intelligence

sources or methods, or cryptology.   Therefore, General Neller's testimony does nothing to satisfy

Defendants' burden that the records pertain to one or more of the classification categories of EO

13526, § 1.4.

In sum, Defendants fail to satisfy their burden of demonstrating with specificity that each

and every record pertains to one or more of the classification categories of EO 13526, § 1.4.

Defendants assert that all records pertain to: (a) military plans, weapons systems, or operations; (c)

intelligence activities (including covert action), intelligence sources or methods, or cryptology;

and (d) foreign relations or foreign activities of the United States, including confidential sources.

33

Yet, Director Bennett only testifies that ***certain records*** pertain to military plans, weapons systems, or operations; Admiral McRaven testifies that all 52 records pertain to military plans, weapons systems, or operations; and no one testifies that any of the records pertain to foreign relations or foreign activities of the United States, including confidential sources.   In addition, the evidence submitted by Defendants is no more than conclusory declarations with overly vague and sweeping statements.  *International Counsel Bureau*, 723 F. Supp. 2d at 63.   Also, Defendants have failed to provide sufficient detail and specificity to warrant any deference.  *Campbell*, 164 F.3d at 30.   It is Defendants' burden to provide sufficient evidence, and Defendants should be ordered to provide it.

> **b.    Defendants fail to demonstrate that all 52 records reasonably could be expected to cause identifiable or describable exceptionally grave damage to the national security.**

Even if Defendants could show – which they cannot – that each and every record pertains to one or more classification categories, Defendants fail to demonstrate that the disclosure of all 52 records "could reasonably be expected to cause identifiable or describable damage to the national security."  EO 13526, § 1.4.   In addition, because the records have been purportedly classified as TOP SECRET, the type of identifiable or describable damage must be "exceptionally grave."   EO 13526, § 1.2.   In an attempt to support Defendants' claim that the release of each and every record reasonably could be expected to cause exceptionally grave damage to the national security, Director Bennett describes two types of records: (1) Harm to National Security from Release of Images of bin Laden and (2) Harm to National Security from Release of Information pertaining to CIA Intelligence Activities and Methods.

Director Bennett asserts that "the release of [] graphic photographs and other images of [bin Laden's] corpse reasonably could be expected to inflame tensions among overseas populations that include al-Qa'ida members or sympathizers, encourage propaganda by various terrorist groups or other entities hostile to the United States, or lead to retaliatory attacks against the United States homeland or United States citizens, officials, or other government personnel traveling or living abroad."[11]   Bennett. Decl. at ¶ 23.   He also states that this is not mere conjecture because "since [bin Laden's] death, al-Qa'ida has already attempted to use the circumstances surrounding his death and burial as propaganda."   *Id*. at ¶ 25.   In addition, Defendants submit General Neller's declaration as evidence that the release of all 52 photographs could be expected to cause exceptionally grave damage to the national security.   General Neller testifies that because other events or incidents in the past have been used as propaganda and have incited violence, the release of each and every record would do the same.   Neller Decl. at ¶¶ 5-6.

In other words, Defendants generally assert that there are some individuals who do not like America.   Director Bennett and General Neller do no more than paint a broad picture of this hatred.   Based on their non-specific declarations, regardless of whether the photographs and video recordings of bin Laden are released, groups like al-Qa'ida may create propaganda, recruit new members, raise funds, inflame tensions, and even incite violence overseas.   In fact, Director

---

[11]      Although Director Bennett purportedly testifies that all records reasonably could be expected to inflame tensions, his testimony is ambiguous at best.   Director Bennett refers to "graphic photographs and other images of [bin Laden's] corpse."   It is unclear whether all non-graphic photographs would be "other images."   As Plaintiff demonstrated above, there are at least five categories of records.   In addition, Senator Inhofe described viewing photographs taken aboard the U.S.S. Carl Vinson, which included the "cleanup period" and the burial at sea.   Also, a senior government official described some of the records as depicting bin Laden's body at a hangar after it was brought to Bagram Airbase in Afghanistan and depicting bin Laden's body wrapped in a shroud in preparation for the burial at sea.   It is not apparent why these photographs reasonably could be expected to inflame tensions as well.

Bennett testifies that even without the release of the records, such actions occurred.   Bennett Decl. at ¶ 25 ("al-Qa'ida has already attempted to use the circumstances surrounding his death and burial as propaganda").

Defendants fail to demonstrate how the release of each and every record could reasonably be expected to cause identifiable and describable exceptionally grave harm to the national security beyond the potential harm that already exists without the release of the responsive records. Moreover, as one federal court has recognized:

> Our nation has been at war with terrorists since their September 11, 2001 suicide crashes into the World Trade Center, the Pentagon, and a field in Shanksville, Pennsylvania, killing thousands and wounding our nation in ways that we still cannot fully recount-indeed, we were at war with terrorists since well before that event. American soldiers are fighting and dying daily in Afghanistan and Iraq. The morale of our nation is a vital concern and directly affects the welfare of our soldiers.   How then to deal with the commands of FOIA and the strong policy it reflects "to promote honest and open government," "to assure the existence of an informed citizenry," and "to hold the governors accountable to the governed"?   Of course, national security and the safety and integrity of our soldiers, military and intelligence operations are not to be compromised, but is our nation better preserved by trying to squelch relevant documents that otherwise would be produced for fear of retaliation by an enemy that needs no pretext to attack?
>
> -----
>
> Our nation does not surrender to blackmail, and fear of blackmail is not a legally sufficient argument to prevent us from performing a statutory command. Indeed, the freedoms that we champion are as important to our success in Iraq and Afghanistan as the guns and missiles with which our troops are armed.
>
> -----
>
> The terrorists in Iraq and Afghanistan do not need pretexts for their barbarism; they have proven to be aggressive and pernicious in their choice of targets and tactics. They have driven exploding trucks into groups of children at play and men seeking work; they have attacked doctors, lawyers, teachers, judges and legislators as easily as soldiers. Their pretexts for carrying out violence are patent hypocrisies, clearly recognized as such except by those who would blur the clarity of their own vision. With great respect to the concerns expressed by General Myers, my task is not to

36

defer to our worst fears, but to interpret and apply the law, in this case, the Freedom
of Information Act, which advances values important to our society, transparency
and accountability in government.

*ACLU v. U.S. Department of Defense*, 389 F. Supp. 2d 547, 575-76 (S.D.N.Y. 2005).   Al-Qa'ida

and other groups do not need a specific reason to incite violence.   They will simply do so.   Since

May 1, 2011, any of the following circumstances could have – and probably did to some extent –

cause groups like al-Qa'ida to create propaganda, recruit new members, raise funds, inflame

tension, and incite violence: President Obama announcing to the world that U.S. forces killed

Osama bin laden; President Obama attending a nationally televised basketball game on the U.S.S.

Carl Vinson, the same aircraft carrier that buried bin Laden's body at sea;[12]  the killing of Senior

Al Qaeda leader Anwar al-Awlaki by a U.S. Predator Drone;[13]  the killing of 46 Pakistani soldiers

by NATO forces;[14]  and the use of drones by U.S. military and intelligence personnel to conduct

surveillance without detection.[15]   Most recently, the Iranian government found a drone lost by

U.S. intelligence forces.   *Id.*   The Iranian government has used the drone's existence and the

U.S.'s acknowledgement to create propaganda.   *Id.*   Groups may use the requested records for

propaganda, but their use would not be exclusive and any future harm cannot and could not be

_____

[12]      Jennifer Epstein, *Obamas All Aboard for Basketball*, Politico.com (November 11, 2011),
attached as Exhibit N to Bekesha Decl.

[13]      *Islamist Cleric Anwar al-Awlaki Killed in Yemen*, BBC News Middle East (September 30,
2011), attached as Exhibit O to Bekesha Decl.

[14]      Haris Anwar, *U.S. Withdraws Last Forces From Airbase Following Deaths in Pakistani
Army*, Bloomberg (December 12, 2011), attached as Exhibit P to Bekesha Decl.

[15]      Thomas Erdbrink, *Iran Demands U.S Apology for Drone Flight*, The Washington Post
(December 13, 2011), attached as Exhibit Q to Bekesha Decl.

directly identified to a particular source.   In other words, Defendants have not presented any

"identifiable" or "describable" evidence that the release of any of the 52 records would cause

exceptionally grave damage to the national security.

Defendants' assertion is speculative at best.   Director Bennett and General Neller believe

that exceptionally grave damage to the national security may occur because it has in the past.

They have not presented any specific evidence that the release of these particular records would

cause exceptionally grave harm to the national security that does not already exist.   Nor have they

demonstrated that they have the expertise or qualifications to make such a determination.   As

Director Bennett and General Neller both testified to and another federal court recognized,

al-Qa'ida and similar terrorist groups do not need a specific reason to hate America.   They simply

do.   Whether a specific incident or event will be used as a justification for violence is nothing

more than speculation.

Also of notable relevance, other graphic post mortem photographs of notable figures have

been released in similar circumstances in the past, without any claim of harm to the national

security, much less an "exceptionally grave" harm.   For example, on July 24, 2003, in the midst of

the war in Iraq, the U.S. Department of Defense released on graphic photographs of the deceased

sons of Saddam Hussein, Uday and Qusay.   *See Uday, Qusay Pictures Released*, FoxNews.com

(July 25, 2003), attached as Exhibit R to Bekesha Decl. (with copy of graphic photographs).

Similarly, the Department of the Army released a gruesome, post mortem photograph of Abu

Musab al-Zarqawi, the Iraqi insurgent leader.   *See* Philip Kennicott, *A Chilling Portrait,*

*Unsuitably Framed*, The Washington Post (June 9, 2006), attached as Exhibit S to Bekesha Decl.

(with copy of graphic photograph).   In fact, the photograph was displayed at a press conference in

a gold frame.   Id.   Defendants do not present any evidence that the release of these photographs resulted in "exceptionally grave" harm to the national security. [16]

In sum, Defendants have not demonstrated that the release of all 52 records would cause anything more than speculative harm to the national security.   Under EO 13526, the potential harm cannot be speculative; it must be identifiable and describable.   Similarly, in a memorandum to all agencies, President Obama instructed that "the Government should not keep information confidential merely" "because of speculative or abstract fears."   Memorandum from President Barack Obama to the Heads of Executive Departments and Agencies, *Freedom of Information Act* (Jan 21, 2009).   In addition, Defendants solely rely on mere conclusory declarations with overly vague and sweeping statements.   *International Counsel Bureau*, 723 F. Supp. 2d at 63.   In addition, Defendants have failed to provide sufficient detail and specificity to warrant any deference.   *Campbell*, 164 F.3d at 30.   It is Defendants' burden to demonstrate that the release of each and every record reasonably could be expected to cause identifiable or describable exceptionally grave damage to the national security, and Defendants should be ordered to provide such evidence.

Even if Defendants are able to provide "identifiable" or "describable" evidence that the release of each and every record would cause exceptionally grave damage to the national security, Defendants' request of the Court is unprecedented.   Defendants have not cited any instance in which a court has held that Exemption 1 properly allows a government agency to withhold material that may inflame tensions among overseas populations, encourage propaganda, or lead to

---

[16]     Director Bennett only testifies that "foreign editorials criticized the release" of the photographs of Abu Musab al-Zarqawi.   Bennett Decl. at ¶ 26.   That may be bad public relations, but it clearly is not exceptionally grave damage to the national security.   Director Bennett does not discuss the photographs of Uday and Qusay Hussein.

retaliatory attacks.   Defendants have not done so, because they cannot.   No court has made such

a decision.   In *ACLU v. U.S. Department of Defense*, the government agencies identified five

reasons why the disclosure of the withheld information might harm national security.   *ACLU*, 628

F.3d at 624.   The defendants argued that the release of the requested records would reveal the

CIA's needs, priorities, and capabilities; degrade the CIA's ability to effectively question terrorist

detainees; provide terrorists with insight into the CIA's interrogation techniques, strategies, and

methods; damage the CIA's relations with foreign governments; and provide al Qaeda with

material for propaganda.   *Id*.   The plaintiff challenged the defendants' assertion that the national

security would be harmed by providing material for propaganda.   The Court, however, did not

decide whether that was a proper justification because the defendants "identified four other

potential harms that the government argues also justify withholding the information under

Exemption 1."   *Id*.   Hence, no Court has ruled that the propaganda justification alone is

sufficient, and this Court should not be the first to create a significant new FOIA exemption.

As stated above, Defendants assert the propaganda justification for all 52 records.   Yet,

unlike the defendants' assertion in *American Civil Liberties Union,* Defendants do not identify

other potential harms to justify the withholding of each and every record.   Defendants, instead,

only assert that there is a ***specific subset of those records*** of which their release would cause harm

to the national security by revealing intelligence activities and methods.   Specifically, Director

Bennett testifies, "In addition to the harm described above, which applies to all of the responsive

images, additional harm to the national security could be caused by the fact that release of ***certain***

***responsive records*** could also reveal intelligence activities and methods that were employed

during or after the operation."   Bennett Decl. at ¶ 28 (emphasis added).   As Plaintiff stated

40

previously, although Plaintiff does not concede that certain records would reveal any information not already publicly available, Plaintiff recognizes that some of the records may be properly withheld to prevent the disclosure of classified reveal intelligence activities and methods, and if Defendants can sufficiently identify such records and that they have been properly classified, Plaintiff does not seek their release.   However, as Plaintiff demonstrated earlier, there are at least five unique categories of records being withheld by Defendants.   In addition, Senator Inhofe described viewing photographs taken aboard the U.S.S. Carl Vinson, which included the "cleanup period" and the burial at sea.   Also, a senior government official described some of the records as depicting bin Laden's body at a hangar after it was brought to Bagram Airbase in Afghanistan and depicting bin Laden's body wrapped in a shroud in preparation for the burial at sea.   Director Bennett therefore fails to provide anything more than overly vague and sweeping statements with no specific correlation to particular records.   *International Counsel Bureau*, 723 F. Supp. 2d at 63. Because his declaration does not to provide sufficient detail and specificity, it is not entitled to deference.   *Campbell*, 164 F.3d at 30.

Similarly, Admiral McRaven testifies that the release of all 52 records "reasonably could be expected to cause harm to the national security" by revealing military plans, weapons systems, or operations.   McRaven Decl. at ¶ 2.   First, Admiral McRaven does not even suggest that the release of the records could be expected to cause ***exceptionally grave*** damage to the national security as required for TOP SECRET material by EO 13526, § 1.4.   Second, as Plaintiff demonstrated above, Defendants fail to identify which records would reveal military plans, weapons system, or operations.   Plaintiff only seeks photographs and video recordings of bin

41

Laden, not records of military plans, weapons systems, or operations.[17]   Admiral McRaven simply does not address the five categories of records and how each one would reveal military plans, weapons, or operations.   Therefore, Admiral McRaven's declaration is insufficient as it does no more than present conclusory statements.   *International Counsel Bureau*, 723 F. Supp. 2d at 63.   In addition, because his declaration does not to provide sufficient detail and specificity, it is not entitled to deference.   *Campbell*, 164 F.3d at 30.

In sum, Defendants have failed to demonstrate that the release of all 52 records could reasonably be expected to cause identifiable or describable "exceptionally grave" damage to the national security.   Director Bennett and General Neller provide nothing more than speculative reasons for why the records should be withheld.   In addition, no court has ruled that the propaganda justification alone is a proper basis for withholding.   Similarly, Director Bennett has not demonstrated that certain records should be withheld because they may reveal intelligence activities or methods.   Nor has Admiral McRaven specified which records should be withheld to prevent the disclosure of military operations.   Therefore, at a minimum, Defendants should be ordered to provide such evidence.   *International Counsel Bureau*, 723 F. Supp. 2d at 63; *Campbell*, 164 F.3d at 30.   If Defendants cannot provide the necessary evidence, they should be ordered to disclose all records responsive to Plaintiff's FOIA request.

---

[17]   Also, Admiral McRaven fails to address whether any portions of the records can be segregated.   *Sussman*, 494 F.3d at 1116.   Therefore, Defendants fail to provide any evidence that visuals of tactics, techniques, procedures, or personnel cannot be segregated from the visual of bin Laden's body.   At a minimum, Defendants should be ordered to demonstrate why they cannot "black out" the visuals of highly sensitive material.

**E.      Defendants Fail to Demonstrate that All 52 Records Are Being Properly Withheld under Exemption 3.**

Exemption 3 permits a government agency to withhold material "specifically exempted from disclosure by certain statutes."   5 U.S.C. § 552(b)(3).   In the instant case, Defendants rely on 50 U.S.C. § 403-1(i) and 50 U.S.C. § 403g.   Section 403-1(i) charges the Director of National Intelligence with protecting intelligence sources and methods from unauthorized disclosure, and Section 403(g) authorizes the CIA to withhold intelligence sources and intelligence methods that are related to the CIA's core function.   *James Madison Project v. Central Intelligence Agency*, 605 F. Supp. 2d 99, 113 (D.D.C. 2009).   Plaintiff does not challenge Defendants' reliance on the two sections; Plaintiff only challenges Defendants' assertion that each and every record falls within the scope of either 50 U.S.C. § 403-1(i) or 50 U.S.C. § 403.

"When analyzing whether the defendant is entitled to invoke Exemption 3, the court need not examine 'the detailed factual contents of specific documents' withheld; rather, 'the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage.'"   *James Madison Project*, 605 F. Supp. 2d at 113-114 (*quoting Morley v. Central Intelligence Agency*, 508 F.3d 1108, 1126 (D.C. Cir. 2007)).   In other words, the Court's sole task is to determine whether all 52 records relate to intelligence sources and methods. *Fitzgibbon v. Central Intelligence Agency*, 911 F.2d 755, 761 (D.C. Cir. 1990).

In support of its assertion that all 52 records would reveal intelligence sources and methods, Defendants rely solely on the declaration of Director Bennett.   *See generally* Defs' Mem. at 17-18.   To demonstrate that records are being properly withheld under Exemption 3, Director Bennett simply testifies that "the information withheld pursuant to exemption (b)(3) is *the same as* the information described above relating to intelligence methods and activities withheld

43

pursuant to exemption (b)(1)."   Bennett Decl. at ¶ 34 (emphasis added).   Yet, as demonstrated

above, Director Bennett's declaration is ambiguous at best in describing which records are being

withheld because they would reveal intelligence activities and methods.   *Id*. at ¶ 28 ("***certain***

***responsive records*** could also reveal intelligence activities and methods") (emphasis added).

Although Plaintiff does not concede that such records would reveal any information not

already publicly available, Plaintiff recognizes that some of the records may be properly withheld

to prevent the disclosure of classified intelligence activities and methods,[18] and if Defendants can

sufficiently identify such records and provide evidence that they have been properly classified,

Plaintiff does not seek their release.   Because Defendants have failed to provide anything more

than overly vague and sweeping statements with respect to their claim of Exemption 3,

Defendants, at a minimum, should be ordered to provide additional evidence to support their

claim.   *International Counsel Bureau*, 723 F. Supp. 2d at 63.   If they cannot produce sufficient

evidence, they should be ordered to produce all records responsive to Plaintiff's FOIA request.

## V.      CONCLUSION

Based on the evidence submitted to the Court, Defendants have failed to satisfy even the

most basic requirements of FOIA.   They have not presented sufficient evidence that an adequate

search for records was conducted.   Nor have they provided any evidence of whether the withheld

records are photographs or video recordings, accounted for the various stages at which the records

were created, or sufficiently correlated specific claims of exemption to particular records or

---

[18]      Also, Director Bennett fails to address whether any portions of the records can be
segregated.   *Sussman*, 494 F.3d at 1116.   Therefore, Defendants fail to provide any evidence that
visuals of intelligence activities and methods cannot be segregated from the visual of bin Laden's
body.   At a minimum, Defendants should be ordered to demonstrate why they cannot "black out"
the visuals of highly sensitive material.

categories of records.   In addition, Defendants fail to demonstrate that the records were properly

classified under EO 13526.   For the foregoing reasons, Defendants' motion for summary

judgment should be denied, and Defendants should be ordered to provide sufficient evidence to

satisfy their burdens under FOIA.

In addition, regardless of whether Defendants are able to provide adequate declarations and

sufficient evidence, Defendants have failed to establish their claims of exemption.   Specifically,

Plaintiffs are entitled to all photographs or video recordings that have not been properly classified

as well as those records for which no military or intelligence secrets will be revealed and for which

the government relies on the unprecedented argument.   For the foregoing reasons, Plaintiff's

cross-motion for summary judgment should be granted, and Defendants should be ordered to

produce all such records.

Dated:   December 14, 2011

Respectfully submitted,

/s/ Paul J. Orfanedes
Paul J. Orfanedes (D.C. Bar No. 429716)

/s/ Michael Bekesha
Michael Bekesha (D.C. Bar No. 995749)
JUDICIAL WATCH, INC.
425 Third Street S.W., Suite 800
Washington, DC 20024
(202) 646-5172

*Counsel for Plaintiff*

45

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-00890 (JEB) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF DEFENSE, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS
NOT IN DISPUTE AND PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff Judicial Watch, Inc., by counsel and pursuant to Local Civil Rule 7.1(h),
respectfully submits this response to Defendants' Statement of Material Facts Not in Dispute and
Plaintiff's Statement of Material Facts in Support of Cross-Motion for Summary Judgment:

**I.     Plaintiff's Response to Defendants' Statement of Material Facts
        Not in Dispute.**

**A.     General Objection**

As an initial matter, Plaintiff objects to Defendants U.S. Department of Defense and Central
Intelligence Agency (collectively "Defendants") statement for failing to comply with Local Civil
Rule 7(h)(1).    The failure to comply with the requirement to file a proper statement of material
facts in "making or opposing a motion for summary judgment may be fatal to the delinquent party's
position."   *Gardels v. Central Intelligence Agency*, 637 F.2d 770, 773 (D.C. Cir. 1980); *see also
Adagio Investment Holding Ltd. v. Federal Deposit Insurance Corp.*, 338 F. Supp.2d 71, 75

1

(D.D.C. 2004); *Smith Property Holdings, 4411 Connecticut L.L.C. v. U.S.*, 311 F. Supp. 2d 69, 78

(D.D.C. 2004); *Robertson v. American Airlines*, 239 F. Supp.2d 5, 8-9 (D.D.C. 2002).

The statement of material facts submitted by Defendants contains an improper mix of fact

and legal argument and "does nothing to assist the court in isolating the material facts,

distinguishing disputed from undisputed facts, and identifying the pertinent parts of the record . . .

nor does it provide the non-movant 'an opportunity fairly to contest the movant's case.'"

*Robertson*, 239 F. Supp. 2d at 9 (citations omitted).   It appears as though Defendants simply cut

and pasted entire paragraphs from its declarations into the statement rather than parsing out the

factual material it asserts is not in dispute.

**B.     Particular Responses**

1.     Undisputed.

2.     Undisputed.

3.     Plaintiff disputes that Defendants searched components that were most likely to

have responsive records.   *See Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145

(D.C. Cir. 2006) (noting the "asymmetrical distribution of knowledge" between a FOIA requester

and an agency in FOIA cases).

4.     Plaintiff lacks knowledge to confirm or deny whether Defendants conducted such

searches.   *See Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir.

2006) (noting the "asymmetrical distribution of knowledge" as between a FOIA requester and an

agency in FOIA cases).

5.     Plaintiff lacks knowledge to confirm or deny whether such events occurred.   *See*

*Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) (noting the

2

"asymmetrical distribution of knowledge" as between a FOIA requester and an agency in FOIA cases).

6.      Plaintiff lacks knowledge to confirm or deny whether such an event occurred. *See Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) (noting the "asymmetrical distribution of knowledge" as between a FOIA requester and an agency in FOIA cases).

7.      Plaintiff disputes that the withheld information was properly classified under Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009).   *See Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) (noting the "asymmetrical distribution of knowledge" between a FOIA requester and an agency in FOIA cases).   In addition, Plaintiff disputes that the declarations establish that the responsive records pertain to the following categories of information included in Executive Order 13526: military plans, weapons systems, or operations; intelligence activities (including covert action), intelligence sources or methods, or cryptology; and foreign relations or foreign activities of the United States, including confidential sources.

8.      Plaintiff lacks knowledge to confirm or deny whether such an event occurred. *See Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) (noting the "asymmetrical distribution of knowledge" as between a FOIA requester and an agency in FOIA cases).

9.      Plaintiff disputes that the declarations establish that release of the responsive records reasonably could be expected to cause harm to the national security of the United States.   *See Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) (noting the

"asymmetrical distribution of knowledge" between a FOIA requester and an agency in FOIA cases).

10.     Plaintiff lacks knowledge to confirm or deny whether such an event occurred. *See Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) (noting the "asymmetrical distribution of knowledge" as between a FOIA requester and an agency in FOIA cases).

11.     Plaintiff lacks knowledge to confirm or deny whether such an event occurred. *See Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) (noting the "asymmetrical distribution of knowledge" as between a FOIA requester and an agency in FOIA cases).

12.     Plaintiff lacks knowledge to confirm or deny whether such an event occurred. *See Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) (noting the "asymmetrical distribution of knowledge" as between a FOIA requester and an agency in FOIA cases).

13.     Plaintiff lacks knowledge to confirm or deny whether such an event occurred. *See Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) (noting the "asymmetrical distribution of knowledge" as between a FOIA requester and an agency in FOIA cases).

14.     Plaintiff lacks knowledge to confirm or deny whether such an event occurred. *See Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) (noting the "asymmetrical distribution of knowledge" as between a FOIA requester and an agency in FOIA cases).

II.     **Plaintiff's Statement of Material Facts Not in Dispute in Support of Cross-Motion for Summary Judgment.**

1.     The post mortem photographs of bin Laden can be categorized as: (1) photographs taken within the compound in Pakistan; (2) photographs of bin Laden's body at a hangar after it was brought to Bagram Airbase in Afghanistan; and (3) photographs taken prior to and during the burial at sea on the U.S.S. Carl Vinson, which depicted bin Laden's body both before a shroud was placed on it and after it was wrapped in the shroud.   Stacia Deshishku, *Even more details on the OBL photos*, CNN (May 3, 2011, 10:59 AM).

2.     On May 3, 2011, then-CIA Director Panetta stated on NBC Nightly News, "I don't think there's – there was any question that ultimately a photograph would be presented to the public.   Obviously, I've seen those photographs, we've analyzed them, and there's no question that its bin Laden. . . . I think there's no question that there were concerns and there were questions that had to be debated about just exactly what kind of impact would these photos have.   But the bottom line is that, you know, we got bin Laden, and I think we have to reveal to the rest of the world the fact that we were able to get him and kill him."   News Transcript, *Leon Panetta talks about whether or not a photo of Osama bin Laden will be released to the public*, NBC Nightly News (May 3, 2011).

3.     On May 4, 2011 at 2:00 p.m., during his Press Briefing, Press Secretary Jay Carney stated, "[T]he President has made the decision not to release any of the photographs of the deceased Osama bin Laden."   News Transcript, *Press Briefing by Press Secretary Jay Carney, 5/4/2011*, The White House (May 4, 2011).

4.     President Obama made the final decision not to release any post mortem photographs of Osama bin Laden on May 4, 2011.   *Id.*

5.       Senator Inhofe said the following during an interview on CNN: In the Arena:

> There are 15 pictures. The first 12 were taken in the compound -- it's obvious it's right after the incident took place. So they're pretty grueling. The other three were taken on the ship. And they included the burial at sea.
>
> So I would say this. Three of the first 12 pictures were of Osama when he was alive. And they did this for the purpose of being able to look at those and seeing the nose, the eyes and his relationship for positive identification purposes. And that was good.
>
> One of the things that was -- you know I had to make my own conclusion on this because they're not really sure. One of the shots went through an ear and out through the eye socket, or it went in through the eye socket and out -- and then exploded. It was that kind of ordinance that it was.
>
> Now that caused the brains to be hanging out of the eye socket, so that was pretty gruesome.
>
> But the revealing shots really, I thought, the pictures, were the three that were taken on the USS Vinson in the Northern Arabian Sea, and they were the ones that showed him during the cleanup period. In the cleanup period, he had some kind of undergarment, very, very pale.

News Transcript, *Bin Laden's Diaries of Planned Attacks; Senator Views Pictures of bin Laden's Body; China Interested in Stealth Technology*, CNN: In the Arena (May 11, 2011).

6.       In the midst of the war in Iraq, the U.S. Department of Defense released on graphic photographs of the deceased sons of Saddam Hussein, Uday and Qusay Hussein.   *Uday, Qusay Pictures Released*, FoxNews.com (July 25, 2003).

7.       On June 7, 2006, the Department of the Army released a gruesome, post mortem photograph of Abu Musab al-Zarqawi, the Iraqi insurgent leader, which was displayed at a press conference in a gold frame.   Philip Kennicott, *A Chilling Portrait, Unsuitably Framed*, The Washington Post (June 9, 2006).

8.       It has been reported that the SEALs used equipment exactly the same or similar to

6

facial recognition devices known as "SEEK II" and/or "HIIDE 5."   Marcus Weisgerber, *Stealth Helo, Other High-Tech Gear Used in Raid*, Defense News at 6 (May 9, 2011); *CSI Bin Laden: Commandos Use Thumb, Eye Scans to Track Terrorists*, Gizmodo (May 3, 2011).

9.      The technical specifications and even a user manual for these facial recognition devices are easily accessible on the Internet.

10.      DoD's website provides the public with the opportunity of purchasing photographs and video recordings of military personnel using facial recognition devices and discussing its capabilities.

Dated: December 14, 2011                    Respectfully submitted,

                                            /s/ Michael Bekesha
                                            Michael Bekesha (D.C. Bar No. 995749)
                                            JUDICIAL WATCH, INC.
                                            425 Third Street S.W., Suite 800
                                            Washington, DC 20024
                                            (202) 646-5172

                                            *Counsel for Plaintiff*