**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JUDICIAL WATCH, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  11-890 (JEB)** |
| **U.S. DEPARTMENT OF DEFENSE,** *et al.*, | |
| **Defendants.** | |

**<u>MEMORANDUM OPINION</u>**

A picture may be worth a thousand words.  And perhaps moving pictures bear an even higher value.  Yet, in this case, verbal descriptions of the death and burial of Osama Bin Laden will have to suffice, for this Court will not order the release of anything more.

On the evening of May 1, 2011, President Barack Obama announced to the world that the United States had conducted an operation that resulted in the death of Bin Laden, the leader of the terrorist organization al Qaeda.  The very next day, Plaintiff Judicial Watch submitted a Freedom of Information Act request to Defendant Department of Defense seeking any photographs and video recordings of Bin Laden taking during or after that operation.  Judicial Watch sent a similar request to Defendant Central Intelligence Agency a few days later.  After both DOD and the CIA advised that they would be unable to process the requests within the time permitted under the statute, Plaintiff filed suit.

Both agencies have since issued final responses to Plaintiff's requests.  After searching the components that it determined were most likely to possess the sought-after records, DOD turned up nothing responsive to Judicial Watch's request.   The CIA, however, located fifty-two responsive records, all of which it withheld.  Specifically, the agency claimed that the

photographs and/or video recordings of Bin Laden's death and burial were exempt from disclosure under FOIA Exemptions 1 and 3, the exemptions for classified materials and for information specifically exempted by other statutes.

Both sides now seek summary judgment. Plaintiff claims that DOD did not conduct an adequate search. In addition, it challenges the level of generality at which the CIA described the fifty-two responsive records and contends that the agency has not demonstrated that each record may be properly withheld under either claimed exemption. For their part, Defendants maintain that DOD's search was sufficient and that the CIA has provided adequate support for its withholdings.

Defendants' arguments carry the day. The affidavits they have provided are sufficient to establish that DOD conducted an adequate search for responsive records and that the records identified by the CIA were classified materials properly withheld under Exemption 1. The Court declines Plaintiff's invitation to substitute its own judgment about the national-security risks inherent in releasing these records for that of the executive-branch officials who determined that they should be classified. The Court, accordingly, will grant Defendants' Motion and deny Plaintiff's.

## I.    Background

On May 1, 2011 (May 2, 2011, in Pakistan's time zone), American forces captured and killed Osama Bin Laden at his compound in Abbottabad, Pakistan. See Transcript of President Obama's May 1, 2011, Remarks, available at http://www.whitehouse.gov/the-press-office/2011/05/02/remarks-president-osama-bin-laden. Executive officials have confirmed that the team then took custody of Bin Laden's body and transported it to the aircraft carrier *USS Carl Vinson* in the North Arabian Sea. See, e.g., Pl.'s Mot. & Opp., Declaration of Michael

Bekesha, Exh. D (Press Briefing by Press Secretary Jay Carney, May 3, 2011) at 2.  There, "[t]he

deceased's body was washed and then placed in a white sheet."  Bekesha Decl., Exh. B (DOD

Background Briefing with Senior Defense Officials from the Pentagon and Senior Intelligence

Officials by Telephone on U.S. Operations Involving Osama Bin Laden, May 2, 2011) at 1.

Religious remarks were read, and the prepared body was placed in weighted bag and onto a flat

board.  See id.  As the board was tipped up, Bin Laden's body slipped into the sea. See id.

Shortly after the President's announcement, the media began to report that the

government had taken photographs of Bin Laden's body in the aftermath of the raid.  See, e.g.,

Bekesha Decl., Exh. A (Stacia Deshishku, "Even More Details on the OBL Photos," CNN, May

3, 2011).  This was confirmed by White House officials, see, e.g., Bekesha Decl., Exh. C (Press

Briefing by Jay Carney and Assistant to the President for Homeland Security and

Counterterrorism John Brennan, May 2, 1011) at 4-5, who suggested that, as of May 3, no

decision had yet been made concerning whether the photographs would be released.  See id.;

Press Briefing by Jay Carney, May 3, 2011, at 2-3.  In particular, Press Secretary Carney

expressed concern about "the sensitivities involved" in releasing the images and the potential

that doing so "could be inflammatory."  Press Briefing by Jay Carney, May 3, 2011, at 3.  CIA

Director Leon Panetta, however, was more confident "that ultimately a photograph would be

presented to the public."  Bekesha Decl., Exh. E ("Leon Panetta Talks About Whether or not a

Photo of Osama Bin Laden Will Be Released to the Public," *NBC Nightly News*, May 3, 2011) at

1.  On May 4, Carney announced that "the President ha[d] made the decision not to release any

of the photographs of the deceased Osama bin Laden."  Bekesha Decl., Exh. F (Press Briefing by

Jay Carney, May 4, 2011) at 1.  The President himself later explained this decision, emphasizing

the "national security risk" involved and stating that the photos might serve "[a]s a propaganda

tool" or "an incitement to additional violence."  Interview with President Obama, *60 Minutes*, May 8, 2011, <u>transcript available at</u> http://www.cbsnews.com/8301-504803_162-20060530-10391709.html.

By letter dated May 2, 2011, Judicial Watch, "a non-profit, educational foundation," Am. Compl., ¶ 3, submitted a FOIA request to DOD for "all photographs and/or video recordings of Osama (Usama) Bin Laden taken during and/or after the U.S. military operation in Pakistan on or about May 1, 2011."  <u>See</u> Def.'s Mot., Declaration of William Kammer, Exh. 1 (Letter from Michael Bekesha, May 2, 2011).  DOD's Office of Freedom of Information (OFOI) received it the following day.  <u>See</u> Kammer Decl., ¶ 3.  By letter dated May 9, 2011, OFOI acknowledged receipt of the request, but advised that it would be "unable to make a release determination . . . within the 20-day statutory time period" and that the 10-day extensions provided for by FOIA would also not provide sufficient time for the agency to complete processing.  <u>See</u> Kammer Decl., Exh. 2 (Letter from Paul Jacobsmeyer, May 9, 2011).

On May 4, Judicial Watch submitted a substantively identical FOIA request to the CIA. <u>See</u> Def.'s Mot., Declaration of John Bennett, Exh. A (Letter from Michael Bekesha, May 4, 2011).  The CIA received it the following day, May 5.  <u>See</u> Bennett Decl., ¶ 5.  By letter dated May 23, the CIA acknowledged receipt of the request and advised Judicial Watch that, in light of "[t]he large number of FOIA requests the CIA receives," it would be "unlikely that [the agency could] respond within the 20 working days the FOIA requires."  Bennett Decl., Exh. B (Letter from Susan Viscuso, May 23, 2011).

Seeking to compel the agency to process its request and release all non-exempt responsive records within the timeframe mandated by the statute, Judicial Watch filed suit against DOD on May 13, 2011.  A few weeks later, it filed an Amended Complaint that added

4

the CIA as a Defendant.  Both agencies have in the meantime finished processing Plaintiff's requests.

In attempting to locate responsive records, DOD's OFOI first determined that the DOD components most likely to have the records Plaintiff was seeking were the Office of the Joint Chiefs of Staff (OCJCS), the U.S. Special Operations Command (USSOCOM), and the Department of the Navy.  See Kammer Decl., ¶ 4.  Officers then proceeded to search those files and electronic record-storage systems within these three components in which they believed responsive records might plausibly be found.  See id., ¶¶ 5-8.  DOD ultimately located no records responsive to Judicial Watch's request.  See id.

The CIA's search was more fruitful.  The agency conducted a search of those "components most likely to have records related to the 1 May 2011 operation" – a determination made easier by "the nature of the operation and the close proximity in time between the operation and Plaintiff['s] FOIA request." See Bennett Decl., ¶ 10.  Fifty-two unique responsive records were located.  See id., ¶ 11.  The records are described by John Bennett, Director of the CIA's National Clandestine Service (NCS), as follows:

> These records are photographs and/or video recordings taken of [Bin Laden] on or about 1 May 2011, the day that the United States conducted an operation that resulted in his death.  These records contain post-mortem images of [Bin Laden]'s body.  As a result, many of them are quite graphic, as they depict the fatal bullet wound to [Bin Laden]'s head and other similarly gruesome images of his corpse.  Many of the images were taken inside of [Bin Laden]'s compound in Abbottabad, Pakistan, in which he was killed, while others were taken as his corpse was being transported from the Abbottabad compound to the location where he was ultimately buried at sea.  Several other images depict the preparation of his body for burial as well as the burial itself.  Some of the responsive photographs were taken so that the CIA could conduct a facial recognition analysis in order to confirm that the body of the deceased individual was that of [Bin Laden].

Id.

But all of these photographs and/or videos, the CIA claims, are beyond FOIA's reach. See id., ¶¶ 12-36. Specifically, Bennett averred both that the records in question are classified materials exempt from disclosure under FOIA Exemption 1 and that they are exempted from disclosure by other statutes and, accordingly, fall within the ambit of Exemption 3. See id., ¶¶13-35. With respect to Exemption 1, Bennett stated not merely that the responsive records are in fact classified, but also that they were properly classified – *i.e.*, that they met the procedural and substantive criteria for classification set forth under Executive Order (EO) 13526. See id., ¶¶ 13-22. His statement concerning EO 13526's procedural criteria is buttressed by the declaration of Elizabeth Culver, the Information Review Officer for the NCS. See generally Def.'s Opp. & Reply, Decl. of Elizabeth Culver. With regard to the Order's substantive requirements, Bennett's averments are supplemented by the declarations of Robert Neller, the Director of Operations, J-3, on the Joint Staff at the Pentagon, and William McRaven, Commander of the USSOCOM. See generally Def.'s Mot., Decl. of Robert Neller; Def's Mot., Decl. of William McRaven.

Both parties now seek summary judgment.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The moving party bears the burden of demonstrating the

6

absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"[A] material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party" on an element of the claim.  Liberty Lobby, Inc., 477 U.S. at

248.  Factual assertions in the moving party's affidavits or declarations may be accepted as true

unless the opposing party submits his own affidavits, declarations, or documentary evidence to

the contrary.  Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992).

FOIA cases typically and appropriately are decided on motions for summary judgment.

Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Bigwood v.

United States Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007).  In a FOIA case, the

Court may grant summary judgment based solely on information provided in an agency's

affidavits or declarations when they describe "the documents and the justifications for

nondisclosure with reasonably specific detail, demonstrate that the information withheld

logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith."  Military Audit Project v. Casey,

656 F.2d 724, 738 (D.C. Cir. 1981). Such affidavits or declarations are accorded "a presumption

of good faith, which cannot be rebutted by 'purely speculative claims about the existence and

discoverability of other documents.'"  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C.

Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

## III.   Analysis

Congress enacted FOIA in order to "pierce the veil of administrative secrecy and to open

agency action to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361

(1976) (quoting Rose v. Dep't of Air Force, 495 F.2d 261, 263 (2d Cir. 1974)) (internal quotation

marks omitted). The statute provides that "each agency, upon any request for records which (i)

reasonably describes such records and (ii) is made in accordance with published rules . . . , shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  Consistent with this statutory mandate, federal courts have jurisdiction to order the production of records that an agency improperly withholds.  See 5 U.S.C. § 552(a)(4)(B); DOJ v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989).  "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary and capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  Reporters Comm., 489 U.S. at 755 (quoting 5 U.S.C. § 552(a)(4)(B)).  "At all times, courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure' . . . ."  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991)).

In this case, Judicial Watch levels a different challenge against each Defendant agency. With respect to DOD, which found no records responsive to its request, Plaintiff contends that that the agency's search was too narrow.  With respect to the CIA, which located fifty-two responsive records, Plaintiff alleges that the agency has neither described those records in sufficient detail nor demonstrated that they are exempt from disclosure.  The Court will first address the deficiencies ascribed to DOD, finding that the agency's search complied with the obligations imposed by FOIA.  It will then turn to the more difficult of Plaintiff's claims and the crux of the dispute: whether the CIA has produced sufficient evidence to support its withholdings.  At the end of the day, because the agency's declarations establish that the records in question were properly classified, that they pertain to the foreign activities of the United States, and that their release could reasonably be expected to damage the national security, the

Court concludes that the photographs and/or video recordings of Osama Bin Laden's body are exempt from disclosure under FOIA Exemption 1.

A.  DOD's Search

To gain summary judgment on Plaintiff's challenge to the adequacy of its search, DOD must demonstrate "beyond material doubt [ ] that it has conducted a search reasonably calculated to uncover all relevant documents." Morely v. CIA, 508 F.3d 1109, 1114 (D.C. Cir. 2007) (quoting Weisberg v. DOJ, 705 F.2d 1344, 1351 (D.C. Cir. 1983)) (internal quotation mark omitted) (alteration in original); see also Nation Magazine v. U.S. Customs Service, 71 F.3d 885, 890 (D.C. Cir. 1995).  The agency "must make 'a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested,' . . . and it 'cannot limit its search to only one record system if there are others that are likely to turn up the information requested.'" Nation Magazine, 71 F.3d at 890 (quoting Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990)).  "A reasonably calculated search," however, "does not require an agency to search every file where a document could possibly exist." Hidalgo v. FBI, No. 10-5219, 2010 WL 5110399, at *1 (D.C. Cir. Dec. 15, 2010) (citing SafeCard Servs., 926 F.2d at 1201).  Instead, it merely "requires that the search be reasonable in light of the totality of the circumstances." Id.  "[A]ffidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by FOIA." Negley v. FBI, 169 Fed. Appx. 591, 594 (D.C. Cir. 2006) (quoting Meeropol v. Meese, 790 F.2d 942, 952 (D.C. Cir. 1986)) (internal quotation marks omitted) (alteration in original).

William Kammer, Chief of DOD's Freedom of Information Division, stated that DOD searched for records responsive to Judicial Watch's request in the three locations determined to

be the most likely to possess responsive records: the OCJCS, USSOCOM, and the Department of

the Navy.  See Kammer Decl., ¶¶ 1, 4.  Within the OCJCS, a single officer maintained all

documents related to the May 1, 2011, operation.  See id., ¶ 5.  That officer searched all hard-

copy records and the only computer used to store electronic records.  See id.  In addition, "the

email files of the Chairman of the Joint Chiefs of Staff, Admiral Mike Mullen, were searched,"

along with "the active inbox on the Exchange server and all supporting personal storage table

files within Admiral Mullen's profile on the Secure Internet Protocol Router network."  Id.  For

its part, USSOCOM searched its headquarters and relevant components, combing "all hard copy

and electronic records including all email records during the inclusive dates of May 1, 2011,

through May 31, 2011."  Id., ¶ 7.  Finally, because Bin Laden's body was buried at sea from the

Navy aircraft carrier *USS Carl Vinson*, OFOI coordinated with the Commander of the U.S.

Pacific Fleet to have the ship's system searched.  See id., ¶ 8.  The Commander advised that no

*USS Carl Vinson* personnel took any photographs or videos of the burial and that a search of the

ship's computer system for email discussions of any such photographs or video recordings had

turned up nothing relevant.  See id.

     Judicial Watch nonetheless challenges the adequacy of DOD's search in three respects.

First, it contends that "DOD did not search at least one critical location – the Office of the

Secretary," Pl.'s Mot. & Opp. at 16, and that this omission rendered DOD's search unreasonably

narrow. Because "it has been widely reported that Secretary Gates advised President Obama

about whether to release post mortem photographs of Bin Laden," Judicial Watch argues that "it

is nearly inconceivable that DOD did not have possession of the photographs" and suggests that

they likely reside in the Office of the Secretary.  Id.  But even if Secretary Gates gave such

advice, it does not necessarily follow that he ever saw the photos.  And even if he did seem them,

that does not mean that he actually possessed them and also retained them in his office.

Plaintiff's speculation that Secretary Gates must have kept copies of these classified records is

just that: speculation.  Because "[a]gency affidavits are accorded a presumption of good faith

which cannot be rebutted by purely speculative claims about the existence and discoverability of

other documents," Negley, 169 Fed. Appx. at 594 (quoting SafeCard Servs., 926 F.2d at 1200)

(internal quotation marks omitted) (alteration in original), such bald conjectures do not

undermine the agency's position.

Second, Plaintiff maintains that Kammer's declaration does not demonstrate that

Defendants searched the Joint Worldwide Intelligence Communications System (JWICS), a

system of interconnected computer networks used by, *inter alia*, DOD and the U.S. Department

of State to transmit classified information.  See Pl.'s Mot. & Opp. at 17.  "Because it has also

been reported that Secretary of State Hillary Clinton provided advice to President Obama about

whether to release post mortem photographs of Bin Laden," Plaintiff reasons, "it is more than

plausible that responsive records were transmitted to/from DOD or the U.S. Department of State

via JWICS."  Id.  Again, Judicial Watch would have the Court infer from the media's reports that

Secretary Clinton advised President Obama concerning the photographs' release that she in fact

possessed copies of those photographs – or, more specifically, that she viewed them through

JWICS.  As with Secretary Gates, however, this inference is entirely unsupported by evidence.

Third, Judicial Watch complains that Kammer did not specifically state that the agency

searched for photographs or videos taken during the "period after the SEALs left Pakistan with

Bin Laden's body."  Pl.'s Mot. & Opp. at 17.  If, as the media have reported, see, e.g. Deshishku,

"Even More Details on the OBL Photos" at 1, such records were made, Plaintiff argues, "it is

highly likely that such records would be in the possession of DOD."  Pl.'s Opp & Mot. at 17.

Kammer's declaration that the search of the *USS Carl Vinson* for mention of "photographs or videos of the burial" turned up no "responsive video recordings or photographs," Kammer Decl., ¶ 8, however, plainly covers photographs and videos taken after the mission in Pakistan.  More broadly, Kammer repeatedly explains that the searches of the various components revealed no "responsive" records.  See id., ¶¶ 5, 7, 8.  Because Judicial Watch requested all photographs and videos "taken during and/or after" the operation in Pakistan, see Letter from Michael Bekesha, May 2, 2011, at 1, Kammer's statements that no responsive records were located clearly includes those records "created subsequent to the completion of the intelligence mission within Pakistan." Pl.'s Mot. & Opp. at 17.  Judicial Watch cannot seriously argue otherwise.

It should be emphasized that this was not a request for some broadly defined class of documents the existence and whereabouts of which the agency was likely unaware and that might be maintained in any number of records systems. On the contrary, Judicial Watch's request related to a discrete set of extraordinarily high-profile records concerning "the most highly classified operation that this government has undertaken in many, many years."  Press Briefing by Jay Carney, May 3, 2011, at 2.  If DOD has possession of these records, the relevant individuals are well aware of that fact.

Judicial Watch's challenge to the adequacy of DOD's search, accordingly, seems to reduce to a suggestion that the agency acted in bad faith (although Judicial Watch makes no explicit accusation to that effect).  Plaintiff, however, has neither rebutted the presumption of good faith afforded the agency's declarations nor proffered "countervailing evidence" that raises "a substantial doubt" as to the adequacy of the agency's search.  Iturralde v. Comptroller of the Currency, 315 F.3d 311, 314 (D.C. Cir. 2003).  On the basis of Kammer's declaration, which provides a "relatively detailed and nonconclusory" explanation of DOD's search, SafeCard

Servs., 926 F.2d at 1200 (quoting Ground Saucer Watch, 692 F.2d at 771)) (internal quotation

mark omitted), therefore, the Court will grant Defendants' Motion and deny Plaintiff's on the

adequacy-of-search issue.

    B.   The CIA's Withholdings

    Although DOD did not possess the records Judicial Watch sought, the CIA found exactly

what Plaintiff was looking for: fifty-two "photographs and/or video recordings taken of [Bin

Laden] on or about 1 May 2011."  Bennett Decl., ¶ 11.  Frustratingly for Plaintiff, however, the

CIA claims that each and every one of them is exempt from disclosure under FOIA.  It is to the

sufficiency of the agency's support for its withholdings that the Court now directs its focus.

    Congress exempted nine categories of documents from FOIA's broad sweep.  "[T]he

statutory exemptions, which are exclusive, are to be 'narrowly construed.'"  Norton, 309 F.3d at

32 (quoting Rose, 425 U.S. at 361). The CIA here relies on the application of both Exemption 1

and Exemption 3.  Exemption 1 applies to materials that are "specifically authorized under

criteria established by an Executive order to be kept secret in the interest of national defense or

foreign policy and . . . are in fact properly classified pursuant to such Executive order." 5 U.S.C.

§ 552(b)(1).  Exemption 3 covers information that is "specifically exempted from disclosure by

statute," if that statute meets certain statutorily enumerated criteria.  Id. § 552(b)(3).

    An agency may invoke Exemption 1 in withholding records "only if it complies with

classification procedures established by the relevant executive order and withholds only such

material as conforms to the order's substantive criteria for classification."  King v. DOJ, 830

F.2d 210, 214 (D.C. Cir. 1987); see also Lesar v. DOJ, 636 F.2d 472, 483 (D.C. Cir. 1980) ("To

be classified properly, a document must be classified in accordance with the procedural criteria

of the governing Executive Order as well as its substantive terms.").  Judicial Watch questions

the CIA's compliance with EO 13526 on both procedural and substantive grounds. As the Court

finds that the CIA's declarations, which are afforded "substantial weight," Halperin v. CIA, 629

F.2d 144, 148 (D.C. Cir. 1980), establish that the agency has properly withheld the photographs

and/or video recordings of Bin Laden's body pursuant to Exemption 1, it will grant Defendants

summary judgment without reaching the question of Exemption 3's applicability.

> 1. *EO 13526's Procedural Requirements*

EO 13526, which "prescribes a uniform system for classifying, safeguarding, and

declassifying national security information," sets out the procedures by which information may

be classified.  The Order's procedural requirements govern a wide set of issues that range from

the authority of the original classifier to the proper identification and marking of classified

material.  The CIA maintains that the declarations of John Bennett, Director of the NCS, and

Elizabeth Culver, Information Review Officer for the NCS, establish that the fifty-two records

were classified consistent with EO 13526's procedural requirements. Both of these individuals

have declared that they possess original TOP SECRET classification authority, see Bennett

Decl., ¶¶ 2, 18; Culver Decl., ¶ 3, that they personally reviewed each of the records at issue, see

Bennett Decl., ¶ 4; Culver Decl., ¶ 7, and that EO 13526's procedural requirements were

satisfied.  See Bennett Decl., ¶ 13; Culver Decl., ¶ 7.

Judicial Watch disagrees.  In its Motion, it argued that Bennett's declaration – the only

one that had then been submitted on the procedural issues – did not suffice to establish

procedural compliance because it failed to identify who originally classified the records, when

original classification occurred (in particular, whether the records were classified before or after

Plaintiff's request was received), the date or event upon which the records will be declassified,

and whether the records were properly identified and marked.  See Pl.'s Mot. & Opp. at 23-27.

14

The CIA subsequently submitted the Culver declaration along with its Opposition and Reply in an attempt to address these specific concerns.  See Culver Decl., ¶ 6.  Culver stated, in relevant part:

> I have confirmed that each of these records satisfies the procedural requirements of Executive Order 13526.  At the time of Mr. Bennett's declaration, these records were marked "TOP SECRET" and were otherwise maintained in a manner that satisfied the procedural requirements of the Executive Order under the circumstances.  Since then the CIA has, out of an abundance of caution, taken additional steps to ensure that each of these records contains all of the markings required by the Executive Order and its implementing directives, including information that reveals the identity of the person who applied derivative classification markings, citations to the relevant classification guidance and reasons for classification, and the applicable declassification instructions.
>
> As for Plaintiff's inquiry concerning the identity of the original classification authority (OCA), after the CIA received these records, they were derivatively classified in accordance with the guidance provided by the CIA's designated "senior agency official," as authorized by Part 2 of the Executive Order.  The CIA official who provides this classification guidance – and is therefore the OCA for these records – is the CIA's Director of Information Management Services, who is the authorized OCA who has been designated to direct and administer the CIA's program under which information is classified, safeguarded, and declassified. When Mr. Bennett, who is himself is [sic] an OCA acting under the direction of the CIA Director, later reviewed each of these records for the purpose of this litigation, he reaffirmed that these prior classification determinations were correct and that the records continued to meet the criteria of the Order.

Id., ¶¶ 7-8 (footnote omitted).

Far from convinced, Judicial Watch suggests that Culver's declaration "only further confirms that Defendants have failed to satisfy their burden of proof."  Pl.'s Reply at 3.   It points out that "derivative classification" is defined by EO 13526 as "the incorporating, paraphrasing, restating, or generating in new form information that is already classified, and marking the newly

developed material consistent with the classification markings that apply to the source information."  EO 13526 § 6.1(o).  "Original classification," on the other hand, is "an initial determination that information requires, in the interest of the national security, protection against unauthorized disclosure."  Id. § 6(ff).  Even if Culver's statements establish that the records were derivatively classified consistent with EO 13526's requirements, so the argument goes, neither her testimony nor Bennett's establishes that an original classification authority originally classified the information properly.  In addition to failing to identify who originally classified the records, her statements do not identify when original classification occurred or whether the records, which she avers now contain the required markings, were properly marked to begin with.  See Pl.'s Reply at 3-9.

As a preliminary matter, Judicial Watch is correct that the CIA's declarations are not a model of transparency.  Although both Bennett and Culver assert that EO 13526's procedural requirements were satisfied, see Bennett Decl., ¶ 13; Culver Decl., ¶ 7, and Culver fleshes out her conclusion with additional details, see Culver Decl., ¶¶ 7-8, neither reveals, for example, the identity of the individual who originally classified the records in question.  The Court, nevertheless, will not order these records released on procedural grounds for two reasons.  First, even if there had been some procedural defect in the original classification, it was cured by proper derivative classification and by Bennett and Culver's subsequent reviews.  Second, even if no cure had taken place, any hypothetical defect would not require that the documents be released so long as it did not undermine the agency's assessment of the substantive criteria for classification.

a.  Any Defect Cured

EO 13526 describes in detail the procedures by which a document may be classified, and FOIA requires an agency to demonstrate conformity with those procedures.  See King, 830 F.2d at 214.  Neither the EO nor the statute, however, specifies the level of detail with which an agency's declaration, which is entitled to a "presumption of good faith," see SafeCard Servs., 926 F.2d at 1200, must recount its compliance.  Especially given the lack of evidence of bad faith, it is thus possible that Bennett and Culver's more general statements that all of EO 13526's procedural requirements were satisfied, see Bennett Decl., ¶ 13; Culver Decl., ¶ 7, are sufficient. See, e.g., Schoenman v. FBI, 575 F. Supp. 2d 136, 151-52 (D.D.C. 2008) (testimony that record was "properly marked 'CONFIDENTIAL' because it contains classified national security information," while "could stand to be more specific as to the procedural requirements," found sufficient).  But in light of Allen v. CIA, 636 F.2d 1287 (D.C. Cir. 1980), overruled on other grounds by Founding Church of Scientology v. Smith, 721 F.2d 828, 830 (D.C. Cir. 1983), which deemed declarations that omitted details such as the identity of the original classifier insufficient to demonstrate procedural compliance, id. at 1292, that is not likely.  Although Allen may be distinguishable – for instance, on the ground that the court found that the agency had also failed to demonstrate substantive compliance – the Court need not venture down that path.

That is because even if Plaintiff were correct in its speculation that there may have been procedural flaws in the original classification, such flaws were cured by proper derivative classification and subsequent classification reviews.  See, e.g., Washington Post v. DOD, 766 F. Supp. 1, 7-9 (D.D.C. 1991) (subsequent review by individual with original classification authority cured actual procedural defects); cf. Carlisle Tire and Rubber Co. v. U.S. Customs Serv., 663 F.2d 210, 215 (D.C. Cir. 1980) ("[P]roper subsequent classification under [a new EO] suffices to cure any procedural and substantive defects in classification which may have existed

under [the old EO].").  Where, as Culver has averred, the individual who conducts the derivative

classification himself has original classification authority, see Culver Decl., ¶ 8, and where two

additional individuals with original classification authority (Bennett and Culver) review the

classified records and attest to their compliance with the EO's procedural and substantive

requirements, speculative defects in the original classification procedure are immaterial.

Culver, moreover, expressly confirms that the records bear "all of the markings required

by the Executive Order."  Id., ¶ 7.  Notably, the EO requires that those markings include, among

other things, the identity of the original classification authority, the agency of origin, and

declassification instructions.  See EO 13526 § 1.6.  Culver's testimony that the records contain

all of the required markings, accordingly, addresses most of the issues Plaintiff has raised, if not

with the specificity it might prefer.  In addition, even if Plaintiff is correct that Culver's

statements imply that the records may not have initially carried all of the required markings, that

they are currently so marked suffices.  See, e.g., Washington Post, 766 F. Supp. at 7 (deemed

adequate that agency, which "concede[d] that many documents were not properly marked," . . .

"under[took] to correct [them]").

Finally, Plaintiff's claim that Defendants must disclose the date of the original

classification is unfounded.  EO 13526 does not require that the date of classification be

indicated on the records themselves, and Plaintiff does not show it need be included in a

supporting declaration.  Plaintiff's explanation for why it needs this information, moreover, does

not hold water.  Plaintiff contends that Defendants must disclose the date of original

classification so as to demonstrate that the additional procedural requirements that pertain to

classifications that occur after FOIA requests are received – specifically, such classifications

must be "accomplished on a document-by-document basis with the personal participation or

under the direction of" particular officials, see EO 13526 § 1.7(d) – did not apply.  But Judicial

Watch's speculation that the records were classified subsequent to the agency's receipt of its

request is belied by Bennett's declaration and its own chronology.  Bennett attests, and Judicial

Watch does not appear to dispute, that the CIA received its FOIA request, which was dated May

4, 2011, see Letter from Michael Bekesha, May 4, 2011, at 1, on May 5.  See Bennett Decl., ¶ 5.

Even according to Plaintiff's own timeline, however, classification occurred before then.  See

Pl.'s Mot. & Opp. at 25.  Indeed, the formal announcement that the records would not be

released came on May 4.  See Press Briefing by Jay Carney, May 4, 2011, at1.  Judicial Watch's

suggestion that the operative date is May 3, the day DOD received its request, see Kammer

Decl., ¶ 3, rather than the day the CIA received its request, moreover, is flawed, since the request

at issue was made to the CIA.  In any event, even if Plaintiff were correct that the records were

classified after its FOIA request was received, Bennett's review of "each" of the responsive

records, Bennett Decl., ¶ 4, which was conducted under the direction of the CIA Director, see

Culver Decl., ¶ 8, meets the requirements of EO 13526 § 1.7(d).  See Washington Post, 766 F.

Supp. at 8-9 (subsequent document-by-document review by appropriate official satisfied parallel

requirement of prior EO).

b.  Defect Would Not Require Release

Even assuming there had been some uncured defect in the original classification

procedure – again, Judicial Watch has presented no evidence that this was in fact the case –

"actual procedural defects do not necessarily require the document to be disclosed."  Allen, 636

F.2d at 1292 n.27 (citing Lesar, 636 F.2d at 478, 484).  Indeed, such a rule "could have

intolerable consequences for national security interests."  Lesar, 636 F.2d at 484.  "To release

these materials because of a mere mishap in the time of classification, when the documents are

19

sworn to contain sensitive information, would only be perverse."  Id.  While this does not mean

that only conformity with the EO's substantive requirements is required, see id., the D.C. Circuit

has emphasized that the consequences of procedural violations vary according to the significance

of the violation.  Id. at 485; see also Allen 636 F.2d at 1292 n.27.  Specifically, where a violation

is "of such importance" that it "reflect[s] adversely on the agency's overall classification

decision," in camera inspection may be necessary.  Lesar, 636 F.2d at 485.  Other violations,

however, "may be insignificant, undermining not at all the agency's classification decision."  Id.

So long as procedural violations do not undermine the agency's decision to classify – as when,

for example, a procedural violation suggests that, contrary to the EO, classification was

undertaken in order to conceal a violation of law – the Court will not order documents to be

released on that ground.

     At the end of the day, given the derivative classification and two subsequent

classification reviews, all by individuals with original classification authority, the averments that

EO 13526's procedural requirements were satisfied, the seemingly undisputed procedural

conformity of the derivative-classification process, and the lack of any evidence tending to

undermine the agency's classification decision, the Court finds that any possible procedural

errors plainly do not warrant release.  In light of the Court's subsequent conclusion that the

records meet EO 13526's substantive criteria for classification, the Court will not order them

released on the basis of merely conjectural procedural shortcomings. "[P]ure speculation as to

the [agency's] procedural compliance" is simply insufficient "to establish that the information

withheld . . . should be produced to Plaintiff – i.e., essentially declassified – notwithstanding its

substantively correct classification."  Schoenman, 575 F. Supp. 2d at 152 n.9.

     2.  *Substantive Requirements*

Having determined that any alleged procedural shortcomings have been cured or do not require the disclosure of those records that meet the substantive classification criteria, the Court now turns to those substantive criteria.  EO 13526 imposes two primary substantive barriers to classification, both of which are at issue here.  First, the information in question must fall within one of the "classification categories" outlined in § 1.4 of the Executive Order.  See EO 13526 §§ 1.1(3), 1.4.  Second, it must be the case that the unauthorized disclosure of the information reasonably could be expected to result in describable damage to the national security.  See id. §§ 1.1(4), 1.4.  As the records at issue have been classified as TOP SECRET, Bennett Decl., ¶ 22, the potential damage to national security must be "exceptionally grave."  EO 13526 § 1.2(a)(1).

a.   Classification Categories

Section 1.4 of EO 13526 identifies eight categories of information that may potentially be subject to classification.  See id. §§ 1.4(a)-(h).  Classified records must "pertain[ ]" to one of these categories.  See id. § 1.4.  The CIA here invokes three of them: "(a) military plans, weapons systems, or operations"; "(c) intelligence activities (including covert action), intelligence sources or methods, or cryptology"; and "(d) foreign relations or foreign activities of the United States, including confidential sources."  Id. §§ 1.4(a), (c), (d).  Specifically, Bennett here avers that "all of the responsive records," which were "the product of a highly sensitive, overseas operation that was conducted under the direction of the CIA[,] . . . pertain to intelligence activities and/or methods as well as the foreign relations and foreign activities of the United States."  Bennett Decl., ¶ 21 (emphasis added).  He further attests that "the responsive records also reveal information concerning 'military plans, weapons systems, or operations.'"  Id.

Judicial Watch maintains, however, that even if the agency's declarations establish that some of the records in question pertain to the classification categories, they do not demonstrate that each of the fifty-two records so pertains.  In particular, while some of the records in question may well reveal classified military tactics or equipment, see McRaven Decl., ¶¶ 2-3, 5-8, and others may well disclose classified intelligence methods, see Bennett Decl., ¶ 29, Judicial Watch contends that Defendants have failed to establish that every one of the records – for example, those "that depict the preparation of Bin Laden's body for burial and the burial itself" – pertains to one or more of the classification categories.  Pl.'s Mot. & Opp. at 32-33.  Without knowing more details about the fifty-two responsive records, Plaintiff asserts, the Court cannot evaluate whether each of them relates to one of the three claimed classification categories.

Plaintiff misses the forest for the trees.  Judicial Watch may be correct that the CIA has not demonstrated that the burial photos, for example, pertain to "intelligence methods." EO 13526 § 1.4(c).  It may similarly be correct that the agency has not shown that the photographs or videos taken as the body was transported to the *USS Carl Vinson* pertain to "military plans . . . or operations."  Id. § 1.4(a).  It is patently clear, however, that all fifty-two records – which, by the terms of Judicial Watch's own request, depict Bin Laden during and after the May 1, 2011, operation in Abbottabad, Pakistan – pertain to the "foreign activities of the United States."  EO 13526 § 1.4(d).  Plaintiff's allegation that "no one testifies that any of the records pertain to foreign relations or foreign activities of the United States," Pl.'s Mot. & Opp. at 34, is plainly contradicted by Bennett's declaration. See Bennett Decl., ¶ 21 ("all of the records pertain to . . . the foreign relations and foreign activities of the United States" (emphasis added)).  Given that the records in question "were the product of a highly sensitive, overseas operation that was conducted under the direction of the CIA," id., no further information is required to conclude that

each of them "pertains" – notably, not a very demanding verb – to the United States' foreign activities.

> b.   National Security

Having concluded, therefore, that all of the records pertain to at least one of the classification categories, only the second substantive hurdle remains.  Specifically, the Court must determine whether the CIA's declarations demonstrate that the release of the images and/or videos "reasonably could be expected to cause exceptionally grave damage to the national security."  EO 13526 § 1.2(1); see also id. §§ 1.1(4), 1.4.  "National security," the Executive Order provides, "means the national defense or foreign relations of the United States."  Id. § 6.1(cc).

Although the Court reviews Defendants' withholdings de novo, see 5 U.S.C. § 552(a)(4)(B), it must afford "substantial weight" to agency declarations where the national security is concerned.  Krikorian v. Dep't of State, 984 F.2d 461, 464 (D.C. Cir. 1993) (quoting Military Audit Project, 656 F.2d at 738); see also ACLU v. DOD, 628 F.3d 612, 621, 624 (D.C. Cir. 2011).  "Because courts 'lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case,'" ACLU, 628 F.3d at 619 (quoting Krikorian, 984 F.2d at 464), they "have consistently deferred to executive affidavits predicting harm to national security, and have found it unwise to undertake searching judicial review."  Id. at 624 (quoting Ctr. for Nat'l Sec. Studies v. DOJ, 331 F.3d 918, 927 (D.C. Cir. 2003)) (internal quotation mark omitted).  Ultimately, "[t]he CIA's arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context."  Id. at 624 (citing Wolf v. CIA, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

In their declarations, Bennett, Neller, and McRaven attest to their beliefs that releasing the records Judicial Watch seeks "reasonably could be expected to result in exceptionally grave damage to the national security."  Bennett Decl., ¶¶ 22-30; Neller Decl., ¶¶ 2-3, 6-10; McRaven Decl., ¶¶ 2-3, 5-8.  These assessments, moreover, are not announced in a conclusory fashion. Rather, each declarant expounds his evaluation of the national-security risk in detail, describing the basis for his beliefs and focusing on those risks that relate to his area of expertise.

Bennett, for one, explains that release of any of the records "reasonably could be expected to inflame tensions among overseas populations that include al-Qa'ida members or sympathizers, encourage propaganda by various terrorist groups or other entities hostile to the United States, or lead to retaliatory attacks against the United States homeland or United States citizens, officials, or other government personnel traveling or living abroad."  Bennett Decl., ¶ 23.  He fleshes out his account with examples of ways in which al Qaeda has already used Bin Laden's death and burial as an opportunity to further its anti-American agenda, and he highlights other examples of the organization's tendency to use similar incidents to propagandize and incite anti-American sentiment.  See id., ¶¶ 24-27.  In addition, Bennett describes "additional harm to national security [that] could be caused by the fact that release of certain responsive records could also reveal intelligence activities and methods that were employed during or after the operation."  Id., ¶ 28.  "By way of example," he explains, "release of post-mortem photographs of [Bin Laden] that were used to conduct facial recognition analysis could provide insight into the manner in which such analysis is conducted or the extent or limitation of such analysis."  Id., ¶ 29.

Neller's testimony is consistent with Bennett's.  His declaration attests to his belief "that extremist groups will seize upon these images as grist for their propaganda mill, which will

result, in addition to violent attacks, [in] increased terrorist recruitment, continued financial support, and exacerbation of tensions between the Afghani people and U.S. and Coalition Forces." Neller Decl., ¶ 6.  He further avers "that the release of the responsive records will pose a clear and grave risk of inciting violence and riots against U.S. and Coalition forces" and "expose innocent Afghan and American civilians to harm as a result of the reaction of extremist groups, which will likely involve violence and rioting." Id.  Neller's assessment not only draws from his "years of experience and judgment," id., ¶ 9, but, like Bennett's, is also buttressed by historical precedent. See id., ¶¶ 7-10.  In particular, Neller references the violence that resulted from *Newsweek*'s incorrect report that "U.S. military personnel at Guantanamo Bay . . . had desecrated the Koran," id., ¶ 7, as well as that which resulted from the "re-publication of the Danish cartoon of the Prophet Muhammad." Id., ¶ 8.

McRaven's partially classified declaration covers somewhat different ground, focusing on the risks relating to the release of information about classified military methods and equipment.  Although the details of the methods and equipment he claims the records would reveal are classified, his conclusion is not:

> It is my opinion that the release of the responsive records could reasonably be expected to cause harm to the national security by making the special operations unit that participated in this operation and its members more readily identifiable in the future; providing the enemy information that will allow them to analyze the [Tactics, Techniques, and Procedures] used during [Sensitive Site Exploitation], including the methods used for identification of captured and killed enemy personnel; and possibly provide them the opportunity to defeat [Special Operations Forces] practices in the future.

McRaven Decl., ¶ 8.

As a threshold matter, the Court agrees with Plaintiff that some of the declarants' testimony, by their own admission, applies only to certain of the fifty-two records at issue.  For

example, the risk of exposing military methods and equipment that McRaven describes and the risk of revealing intelligence techniques that Bennett explains only relate to some of the records in question. "Obviously, images taken on board the *USS Carl Vinson* of the burial at sea are not going to reveal site exploitation tactics, techniques, or procedures used in the Abottabad compound or even facial recognition techniques or capabilities." Pl.'s Reply at 11. The military- and intelligence-related risks, accordingly, cannot corroborate the CIA's claim that <u>each</u> of the fifty-two responsive records is properly classified. In order to obtain summary judgment on its claim that the release of any of the records in question reasonably could be expected to pose a risk of harm to the national security, the agency thus must rely on those national-security risks that are applicable to <u>all</u> of the records. Put differently, the Court must find that the declarants' predictions of national-security harm are both "plausible" and "logical" with respect to even the most innocuous photograph of the deceased Bin Laden.

Although this frame takes McRaven's declaration out of the picture, Bennett and Neller's specific and detailed averments, which are based on long and distinguished careers in the intelligence community, suffice to carry the government's burden. Remember, "[t]he test is not whether the court personally agrees in full with the CIA's evaluation of the danger – rather, the issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in which the CIA is expert and given by Congress a special role." <u>Gardels v. CIA</u>, 689 F.2d 1100, 1105 (D.C. Cir. 1982); <u>see also</u> <u>Military Audit Project</u>, 656 F.2d at 738 ("[T]he Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [*sic*] might occur as a result of public disclosures of a particular classified record."). Bennett and Neller's accounts easily clear the low hurdles of reasonableness, logic,

and plausibility.  Their assessments, moreover, are "called into question [neither] by contradictory evidence in the record [n]or by evidence of agency bad faith."  <u>Halperin</u>, 629 F.2d at 148.

Because Bennett and Neller's explanations of the national-security risks apply to <u>any</u> photograph or video recording of Bin Laden's body, moreover, Defendants need not further disaggregate the fifty-two responsive records.  No further information about the records is necessary to "demonstrat[e] 'that material withheld is logically within the domain of the exemption claimed.'"  <u>Campbell v. DOJ</u>, 164 F.3d 20, 30 (D.C. Cir. 1998) (quoting <u>King</u>, 830 at 217).  As Bennett's description of the responsive records is "specific enough to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding," <u>King</u>, 830 F.2d at 218, individual descriptions of each record are not required.  Nor is <i>in camera</i> review.

While Judicial Watch expresses concern that deferring to an agency's assessment of generalized risks related to potential propagandizing and the inflammation of anti-American sentiment opens the door to potentially unlimited withholdings, such justifications will only pass muster where, as here, they are sufficiently detailed and both plausible and logical.  If the risks Bennett and Neller anticipate are speculative, such is the nature of risk.  Indeed, "any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm." <u>ACLU</u>, 628 F.3d at 619 (quoting <u>Wolf</u>, 473 F.3d at 374) (internal quotation mark omitted).  The United States captured and killed the founding father of a terrorist organization that has successfully – and with tragic results – breached our nation's security in the past.  Bennett and Neller's testimony that the release of images of his body could reasonably be expected to pose a risk of grave harm to our

future national security is more than mere speculation.  While al Qaeda may not need a reason to

attack us, that does not mean no risk inheres in giving it further cause to do so.

It is true, as Plaintiff points out, that in <u>ACLU v. DOD</u>, the D.C. Circuit did not reach the

question of whether the agency's argument that withheld documents "would be effective

propaganda for al Qaeda" sufficed to justify its classification of those documents and subsequent

claim for exemption.  628 F.3d at 624.  But failure to reach that question, of course, does not

equate with a rejection of that justification. In any event, that case raised a distinct issue about

whether the propaganda-based national-security justification made sense where the potential for

propagandizing stemmed from the fact that the allegations contained in the documents in

question were "embarrassing to the United States and possibly violations of law." <u>Id.</u>  Because

the relevant EO "prohibit[ed] the classification of information to 'conceal violations of law' or to

'prevent embarrassment to a person, organization, or agency,'" the agency's justification was

called into question. <u>Id.</u> (quoting EO 12958 § 1.7(a)(1)-(2)).  No such issue, however, is

presented here.

The Court is also mindful that many members of the public would likely desire to see

images of this seminal event.  Indeed, it makes sense that the more significant an event is to our

nation – and the end of Bin Laden's reign of terror certainly ranks high – the more need the

public has for full disclosure.  Yet, it is not this Court's decision to make in the first instance.  In

the end, while this may not be the result Plaintiff or certain members of the public would prefer,

the CIA's explanation of the threat to our national security that the release of these records could

cause passes muster.  This was "the most highly classified operation that this government has

undertaken in many, many years." Press Briefing by Jay Carney, May 3, 2011, at 2.  The

Director of the NCS, the USSOCOM Commander, and a Director of Operations on the Joint

Staff of the Pentagon – not to mention the President of the United States – believe that releasing the photographs and/or videos of Bin Laden's body would threaten the national security.  While "deference is not equivalent to acquiescence," <u>Campbell</u>, 164 F.3d at 30, the CIA's declarations are comprehensive, logical, and plausible.  This Court will not overturn the agency's determination on Plaintiff's speculation that these executive-branch officials made an over-cautious assessment of the risks involved.  FOIA permits an agency to withhold properly classified information in the interest of national security; as the CIA has established that the records Judicial Watch seeks were properly classified, the Court will not order them released.

## IV.   Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order granting Defendants' Motion for Summary Judgment and denying Plaintiff's.


_/s/ James E. Boasberg_
JAMES E. BOASBERG
United States District Judge

Date:  <u>April 26, 2012</u>